PYRENE MFG. CO. v. URQUHART et al.

Civ. A. No. 3149.

District Court, E. D. Pennsylvania.

Sept. 10, 1946.

Charles H. Howson, of Philadelphia, Pa., and Maxwell Barus and John B. Cuningham, both of New York City, for plaintiff.

William A. Gray, of Philadelphia, Pa., Arthur G. Connolly, of Wilmington, Del., and J. Matthews Neale, of Washington, D. C., for defendant.

KIRKPATRICK, District Judge.

This action, by Pyrene Manufacturing Company against Radcliffe M. and George G. Urquhart, is for a declaratory judgment that United States patents Nos. 2,106,043, issued January 18, 1938, and 2,198,585, issued April 23, 1940, to the Urquharts, are invalid and not infringed. There is a counterclaim for infringement.

The patents are for method and apparatus for generating and throwing fire-extinguishing foam. The usefulness of foam fire fighting equipment is principally in connection with gasoline fires, its largest user to date having been the Navy.

Various types of equipment for smothering fires with blankets of foam have been in use for some 30 years. In the earlier apparatus chemical mixtures were used with water so that the small bubbles of which the foam was composed would be filled with carbon dioxide. A stabilizer of some soapy substance was added to pre-serve the bubble formation. Foam so produced is generally referred to as chemical foam.

The Urquhart patents have to do with a different type of fire foam, known as mechanical foam. In this type of equipment no chemicals are used, a stream, composed of stabilizer and water only, being thoroughly mixed with air so that when projected it will produce a foam blanket, which in practice has proved quite as effective as chemical foam. Its chief advantages lie in its less cumbersome equipment, the elimination of the storage and feed problems of the chemical foam process and of the extra man power required by the latter. On shipboard, particularly, these advantages make it greatly to be preferred to the chemical type.

Upon the issue of validity, the single question is whether the patents constitute any patentable advance in the art over three earlier patents to Wagener, being British 272,993 of 1927, United States 1,821,914 of September 1, 1931; and German 521,973 of October 10, 1931. The only difference between the two Urquhart patents is that the second claims method only and specifies air, instead of gas generally, as one of the elements producing the foam. The three Wagener patents all embody substantially the same idea. The Urquhart patent of 1938 and the Wagener American patent of 1931 are fully representative of their respective groups and, unless otherwise stated, may be taken as the patents referred to in this discussion.

The Urquharts' process claims will be first considered. They are claims 12 and 14. Claim 12 is as follows: "12. Method of producing a fire-extinguishing foam which comprises ejecting one or more high velocity streams of liquid from a corresponding number of nozzles in such manner as to impart a high degree of turbulence to the body of said stream of liquid, thereby finely subdividing the same, and entraining gas into and by means of the resulting stream of subdivided liquid in the presence of a foam-promoting agent." Claim 14, while quite different in terminology, is substantially the same in substance and scope.

There is no serious question that, if valid, these claims are infringed.

Placing the Wagener and Urquhart patents side by side, it is at once apparent that there is a very close correspondence between their disclosures. The motivating mechanism in each is the same well-known mechanical device, commonly known as a water jet air pump and described in the Wagener patent as such, and also as an "injector." Wagener refers to the critical action as "intimately mixing by mechanical means, the gas with the liquid." The Urquhart claims call it "finely subdividing" the stream, also, acting "to aspirate the gas and to cause a mingling of said liquid and gas." There is only a shade of distinction between these two descriptions of the function of the jet air pump. The object of both patents is to make efficient fire foam, and an "intimately mixed" stream which will accomplish that result is to all practical intents and purposes the same as a "finely divided" stream which will do it, or an "aspirated" or "mingled" stream.

It is not contended that the Urquharts originated mechanical foam. The basic idea with which the whole development of that type of fire fighting apparatus began, namely, that of incorporating air into an advancing stream of mixed water and stabilizer, appears in Wagener. It is contended, however, by the Urquharts that the process described by Wagener is inoperable and cannot be considered as an anticipation, because the patent does not give sufficiently explicit instructions to make it workable in the hands of the ordinarily skilled practitioner. The argument is that not only does Wagener fail to disclose the employment of a type of water jet air pump which subdivides the stream but that, by the frequent use of the term "injector," taken in connection with the fact that that term in the existing fire foam art meant an injector with a smooth-bore nozzle, he definitely limits the operation to a solid stream which, concededly, will not produce foam.

The point at which it is claimed that the Urquhart patent supplies the deficiencies of Wagener and discloses an operable process lies in its teaching that, in order to discharge the stream of mixed water and stabilizer from what may be called the motivating nozzle (the nozzle of the water jet air pump) in the requisite "turbulent" or "subdivided" state, means, consisting of a spiral or baffle in the nozzle or of impinging jets, or some equivalent, must be used. If invention is to be attributed to the Urquharts it must be found at this point, or not at all.

It may be conceded at once that the Wagener patents do not, either expressly or impliedly, call for special means to give the stream any particular kind of turbulence or subdivision or any higher degree of either than it would acquire by being discharged from a smooth-bore nozzle.

However, I cannot agree that the practitioner under the Wagener patents is not free to use any kind of nozzle he wants—smooth-bore, rough-bore, spiraled or baffled. The Urquharts' proposition is that, as of 1927–1931, "injector" would mean to a fire-foam engineer one of the types of common devices, like the steam injectors shown in standard text-books of the time, which invariably had smooth-bore nozzles. These injectors, in commercial practice, were specially engineered to prevent dispersion of the stream. They had to be, because their object was to gain the greatest possible forward momentum and this required keeping the stream as solid as possible.

While it may be true that the attention of a "fire-foam engineer" would turn at first to the more common type of injector, no engineer was ignorant of the fact that a stream of water issuing from a nozzle will be dispersed to varying degrees by roughness of the interior, or by a spiral or baffles or by the shape of the nozzle itself, and it is hard to believe that any engineer would not know of the existence of the smaller though by no means uncommon class of injectors, sometimes called "ejectors," the purpose of which was to withdraw air from vacuum chambers or to clear rooms of vapor and which were designed to get the maximum entrainment of air at the expense of propulsive energy. One ejector of this kind was the Schutte & Koerting Obnoxious Vapor Condenser, and there were others, all of which had long been using various means in the nozzle for increasing the aspirating and mixing efficiency of the liquid jet. It would seem that Wagener,

whose announced purpose was to get an intimate mixture of air and liquid, could hardly have intended to exclude, by such general language as "a water jet air pump or an injector or the like," the use of any type of mechanism which would do what he wanted.

In substance, both patents teach a method of making fire foam by entraining air into the stream—not just carrying some air along. Both patents say that it is to be done by means of a mechanical device which accurately answers to the description, "water jet air pump." The Urquhart patent suggests as "advantageous" a spiral or other suitable baffle to be placed in the motivating nozzle to give turbulence and mechanical subdivision to the stream but expressly states "this action is not absolutely necessary for the present invention."

Two questions thus arise. The first, a preliminary one, is whether the spiral or its equivalent is really the thing on which successful operation depends—whether it is necessary for the invention. The second and basal question is whether the introduction of that mechanical expedient into the Wagener apparatus constitutes an inventive step.

Obviously, if a smooth-bore nozzle can create sufficient turbulence in the stream issuing from it to make an entirely satisfactory fire foam, the spiral is not necessary to the invention. The Urquharts contend that it cannot, and Pyrene that it can, and both sides undertook to support their respective claims by tests of the Wagener apparatus, motion pictures of which were exhibited to the Court. Each party constructed its own idea of the Wagener apparatus for its own test and, not unexpectedly, the Urquhart experiments produced nothing but frothy liquid and the Pyrene experiments produced what certainly looked to me like good fire foam. One thing, apparent from the experiments and the testimony about them, was that, apart from any special devices for breaking up the stream, there are several matters of engineering which have a great deal to do with the making of satisfactory fire foam. Thus, the proportioning and positioning of the tailpiece, or discharge pipe, which receives the jet from the nozzle, requires careful attention. Of paramount importance, however, is the design or shaping of the nozzle-bore.

Unquestionably, a smooth-bore nozzle, if very carefully designed to that end, can be made to deliver a stream, practically solid except for light, atmospheric feathering of its surface; and this kind of stream will not make foam. This much the Urquharts certainly proved.* The Pyrene experiments on the other hand established, I think, that it is equally possible to shape a smooth-bore nozzle in such a way that the stream will be considerably dispersed and (and this is the nub of this part of the case) sufficiently dispersed to make a useful fire foam, good enough to put out a gasoline fire in a very short time.

It may be that the stream delivered by Pyrene's embodiment of the Wagener patent cannot quite be described as having "turbulence." And it may be that there is a margin of improvement possible if the whole thing be redesigned and a spiral, or impinging jets, used, as in some of Pyrene's commercial apparatus, but the object of the test was merely to show that satisfactory foam could be made. In so doing, the test demonstrated that the Urquhart specification was correct in saying that the use of the special means suggested for dispersing the stream was not absolutely necessary to the invention. It does, however, appear to have been enough of an improvement to be adopted by Pyrene in its commercial equipment, and the question, whether it involved invention, remains. The fact that good fire foam can be made without it has an important bearing upon that question but does not necessarily settle it.

---

* The Urquhart Wagener device was made with an injector type nozzle so designed by tapering it as to make a solid stream and the Wagener drawings do show externally a tapered pipe. However, the Wagener specifications say nothing about the design of the pipe, the drawings are diagrammatic and do not show its internal structure and it cannot be assumed that Wagener intended to engineer his water jet pump so that it would not work, if it could be constructed so that it would.

Fully realizing that hindsight often gives a fictitious clarity of vision, it is certainly safe to say that from the earliest days of mechanical foam, everyone interested in it must have known that in order to create a foaming stream one had to have a considerable amount of air in the stream to supply the gaseous portion of the foam. This much was fundamental. When it became desirable to discard the use of chemicals and to rely entirely on the mechanical qualities of the foam itself, it seems almost inconceivable that a competent engineer would shut his eyes to the known class of jet air pumps which were designed so that they would take up to as much as 25 or 30 volumes of air into the stream, and confine himself to the injector type nozzle—a nozzle specially designed so that it would entrain only 1 to 1½ volumes of air—admittedly wholly inadequate. He might, of course, begin by simply designing the smooth-bore nozzle so as to get dispersion, something which could easily be done, but it seems to me that in the exercise of ordinary mechanical ingenuity he would almost certainly have taken up also the use of various well-known devices the purpose of which was to increase dispersion and aspirate the stream. The Wagener patent taught the use of a jet air pump and even if it had confined its disclosure to the smooth-bore injector type (which it did not) I do not believe that it required invention to make use of simple and well-known expedients for breaking up a stream of water.

I, therefore, find that the Urquhart process claims do not have patentable novelty over Wagener and are therefore void for want of invention.

I am not overlooking the importance of forward throw as well as dispersion in fire fighting equipment. Of course, the operator must stand as far away from the fire as possible. Captain Burke's unsuccessful efforts to get a satisfactory throw with a smooth-bore nozzle were not intended as faithful practice of the Wagener disclosure. So many engineering details, having to do with the shape, dimensions and position of the tailpiece or discharge pipe, were involved in the problem that I do not accept those tests as conclusive. As against them McNulty's experiments, with what was unquestionably the Wagener device, obtained a forward throw of approximately 20 feet, which is, at least, fairly satisfactory.

The Urquharts submit as evidence of invention or, at least, as evidence that the Wagener patent did not disclose a workable method, a history of commercial development which, in substance, comes down to the admitted fact that Pyrene, a large manufacturer and something of a pioneer in the commercial development of fire foam, although it had the Wagener patent in its control in 1931, failed to exploit mechanical foam commercially for several years, and then did so only after it had advance information, through an interference proceeding, of the Urquhart disclosure. The argument might have some force if it appeared that the then widely used chemical foam was generally recognized as unsatisfactory and that the art was engaged in an intensive search for some means of producing mechanical foam. Such, however, does not appear to be the case. The commercial adoption of mechanical foam was waiting, not so much upon the advent of a practicable method and apparatus, as upon two other developments—first, the production of a cheap stabilizer, and second, persuading the public that the presence of carbon dioxide or other noninflammable gas was not necessary in order to put out fires by means of foam.

As to the apparatus claims in suit, I am of the opinion that they are both invalid and not infringed.

In all four of these claims the substance of the disclosure is an arrangement in series of a mechanical device for premixing the water and stabilizer, and a water jet air pump accomplishing the object described in the method claims. The premixing device is usually designated merely as "means" etc., but the patent drawings show it to be an ordinary liquid ejector or, alternatively, a mixing pump of which no details are given in the specifications.

Only very remotely is there anything which can be described as co-action between these two elements of the purported combination. The premixing device or first ejector is simply a means of preparing and forwarding the stream which is to be dis-

persed and projected by the second. Except for the fact that it picks up the stabilizer, its functional relationship to the basic principle of the apparatus patented, differs only in degree from that of the fire hydrant which supplies the original motive power.

On the whole, I think these claims amount to no more than an aggregation, but if the patent escapes that fault it is invalid for want of patentable novelty over the Burmeister English patent of 1927. Burmeister shows two ejectors arranged in series for moving the stream of water, the only difference between it and the Urquhart being that the second one, instead of picking up air, picks up chemicals. It having been held that the water jet air pump of the Urquhart patent with its spiral nozzle is not in itself a patentable improvement, the Burmeister patent constitutes a fairly complete anticipation of the only thing which the Urquhart apparatus claims add to their method claims.

The series arrangement of the two motive devices used by the apparatus claims for advancing the stream and incorporating foam forming elements into it places the Pyrene devices beyond the line of infringement. There is no series arrangement in them, except possibly in their high pressure device for the Army Air Corps, as to which it is not necessary to express an opinion so far as the question of infringement is concerned.

The question, raised by Pyrene, that the licensing system adopted by the Urquharts constitutes a misuse of their patent and bars them from relief under their counterclaim, remains to be considered. In view of the holdings that the patents are invalid and that the apparatus claims of the 1938 patent are not infringed, the decision of this question is not strictly necessary, but the case will in all likelihood be appealed and all questions presented to this Court should be disposed of.

█ The rule is that a patentee may not use his lawful monopoly under his patent to create an unlawful monopoly in unpatented articles. In National Lockwasher Co. v. George K. Garrett Co., Inc., 3 Cir., 137 F.2d 255, 256, it was stated in the following language: "The patentee cannot use his patent monopoly to force upon customers his brand of a non-patented article to be used by the customer in connection with the patented article sold or leased." Of course, this applies not only to the patentee's brand of the unpatented article but also to any one else's as well. It is the unlawful restraint of trade which is forbidden, and the fact that the patentee himself does not directly profit from it in dollars and cents is immaterial if he accomplishes the restraint by aiding and abetting another.

█ The Urquharts do not manufacture or sell any equipment or any material used with it, but confine their business to the granting of licenses. They are willing to grant licenses both to persons desiring to manufacture and sell the equipment and to persons desiring merely to use the patented process. The manufacturers who have taken licenses make and sell unpatented stabilizer as well as the patented equipment. Under the Urquhart licenses they pay royalties based on both the price which their customers pay for the equipment and the price which they pay for the stabilizer. So far as the royalty which the manufacturing licensees pay is concerned, the arrangement is not objectionable, since any convenient method of fixing a royalty fee may be adopted, including using the price of unpatented articles sold with the equipment as a basis.

Persons who buy equipment from the manufacturing licensees receive from the latter, as agents for the Urquharts, free licenses to use the process, but they pay what amounts to a royalty, included in the price of the stabilizer, and it is a condition of their license to use the process that they buy the stabilizer from a manufacturing licensee and from no other source.

The Urquharts have adopted and have stated their purpose to adhere to a policy which discriminates between users of the process who buy stabilizer from the manufacturing licensees and users who buy it elsewhere. If and when any non-manufacturing would-be user, who expects to buy his stabilizer in the general market, applies direct to the Urquharts for a license to use

the process, he will be charged a royalty which, other things being equal, will make it more expensive for him than for those who have obtained licenses by purchasing from the manufacturing licensees. The discrimination involved is, not as the Urquharts appear to view it, between manufacturers and users but between two classes of users. The effect of the discrimination is to limit free competition in the stabilizer field by penalizing users who buy from all except certain manufacturers.

The case thus presented is on all fours with Barber Asphalt Corp. v. La Fera Grecco Contracting Co., 3 Cir., 116 F.2d 211, except for two points, neither of which lessens the controlling force of that decision.

The Urquharts themselves do not, as Barber Asphalt did, manufacture and sell the unpatented product which is the subject of the discrimination. As already pointed out, however, it is unimportant whether a patentee's interest in the benefits arising from misuse of a monopoly is direct or indirect.

■■ So far as the evidence shows, the Urquharts up to now have put only half of their licensing system into effect. They have licensed two or three manufacturers and have empowered them to grant licenses to users on condition that the users buy stabilizer from the manufacturing licensees, but no prospective user has as yet applied to them for a license to enable him to use the process with stabilizer purchased from other manufacturers, in competition with the Urquharts' licensees. Mr. G. G. Urquhart stated unqualifiedly that they have no intention of granting such prospective users' licenses upon the same royalties as those specified in their agreements with manufacturing licensees. In other words, the Urquharts have the intention (and the power if their patents are valid) to use their patents to interfere with free competition in unpatented stabilizer. That the law forbids. This announced policy may or may not be the reason why no prospective users have applied to the Urquharts for licenses, but it is not necessary that such be the fact. The rule against misuse of the patent monopoly is based on the policy of the anti-trust laws and these laws forbid an agreement or conspiracy in restraint of commerce, whether followed by overt acts carrying it into effect or not. United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700, 50 A.L.R. 989.

The Urquharts argue that their proposed system embodies a sound and equitable business policy, in that it in effect allows their manufacturing licensees to compensate themselves for sales expenses in promoting the sale of the process. This may be true but "The patent monopoly is not enlarged by reason of the fact that it would be more convenient to the patentee to have it so * * *.", B. B. Chemical Co. v. Ellis, 314 U.S. 495, 498, 62 S.Ct. 406, 408, 86 L.Ed. 367.

I, therefore, hold that in the present case the Urquhart counterclaim is barred by reason of the misuse of the patents.

The statements of fact and conclusions of law in the foregoing opinion may be taken as special findings of fact and conclusions of law.

An order for judgment may be presented.