## URQUHART et al. v. UNITED STATES.

No. 49384.

United States Court of Claims.

Jan. 13, 1953.

Arthur J. Phelan, Washington, D. C., for plaintiff. Hogan and Hartson, J. Mathews Neale and Strauch, Nolan & Diggins, Washington, D. C., were on the brief.

James P. Burns, Washington, D. C., with whom was Asst. Atty. Gen. Holmes Baldridge for defendant.

Roy C. Hackley, Jr., T. Hayward Brown and William W. Fleming, Washington, D. C., were on the briefs.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

HOWELL, Judge.

The petition in this case as originally filed on November 29, 1949, was for the alleged unauthorized use of United States letters patent Nos. 2,106,043 and 2,198,585, which patents were issued jointly to Radcliffe Morris Urquhart and his brother, George Gordon Urquhart, the original plaintiffs. On December 29, 1949, George Gordon Urquhart formally assigned to Radcliffe Morris Urquhart his entire right, title, and interest in the two patents in suit and also the right to sue for and recover for all past and future infringements of the two patents. Since that date, Radcliffe Morris Urquhart has been the sole owner of both patents in suit, and is now the sole plaintiff in this case.

On September 11, 1950, the plaintiff and defendant filed a joint motion to permit defendant to withdraw its general traverse and to substitute therefor a special plea of misuse of the alleged patent monopoly of the Urquharts, the original plaintiffs. On September 18, 1950, the defendant filed its special plea of misuse of the patent monopoly on the ground that the licensing system of the Urquharts with respect to the two patents in suit was a misuse of the patent monopoly contrary to public policy and law, and in violation of the policy of the anti-trust laws. Pursuant to the allowance of the motion and defendant's special plea, the parties proceeded to trial solely on this issue.

Modern firefighting technique has demonstrated that a very efficient method for fighting oil or gasoline fires is to cover the burning material with a blanket of foam. Two kinds of foam have been used for this purpose, one being known as "chemical foam" because it is formed by the reaction of chemicals which when brought together produce a foam consisting of a fluid intermixed with bubbles of gas. The other type of firefighting foam is known as "mechanical foam." In this type, bubbles of gas or air are entrained by physical agitation of a firefighting fluid to which a foam-forming material is added.

The patents in suit deal with the production of mechanical foam, patent No. 2,106,043, relating both to a foam-producing mechanism and a method of producing mechanical foam, and patent No. 2,198,585 relating to a method of producing mechanical foam. The mechanism and methods covered by these two patents are sufficiently illustrated for the present purposes by claim 4 of patent No. 2,106,043 and claim 1 of patent No. 2,198,585, which read as follows:

"4. Apparatus for producing foam, comprising means for supplying a foam-forming material, means for passing a stream of water through a constricted opening, a channel receiving such stream of water and connected to the means for supplying the foam-forming solution, whereby the water withdraws the solution therefrom, means for exposing the resultant mixture to gas in a manner to cause commingling of said gas with said mixture, and means for increasing the surface of said mixture exposed to said gas.

"*      *      *      *      *      *

"1. Method of producing a fire-extinguishing foam which comprises ejecting one or more high velocity streams of liquid from a corresponding number of nozzles in such manner as to impart a high degree of turbulence to the body of said stream of liquid, thereby finely subdividing the same, and aspirating air from the atmosphere into and by means of the resulting stream of subdivided liquid in the presence of a foam promoting agent."

No particular kind of foam-forming material or "stabilizer", as it is sometimes called, is covered by any claim of either of the two patents in suit. In fact, the patents emphasize this, for the following state-

ment with reference to this material is made in both patents:

"This will usually be an aqueous solution of a secondary extract of licorice, extract of tan bark, saponin, or other suitable substance. These are known in the trade as "stabilizers". The invention is not limited to the use of any particular type of foam-forming material."

So far as the present issue is concerned, the foam-forming material or stabilizer is an unpatented material.

The Urquharts have not commercially manufactured or sold foam producers or foam stabilizers for mechanical foam but instead have depended upon the issuance of licenses for the promotion of and compensation for the use of the two patents in suit. The Urquharts formulated two different licensing plans, each of which involved the licensing of the unpatented foam-forming material.

Under one plan the Urquharts entered into license agreements with three appointed manufacturers of fire-extinguishing equipment and supplies, namely, The National Foam System, Inc., Fire Appliance Company, and Walter Kidde & Company. These three agreements were substantially the same in character, and the pertinent portions of them as typified by the National agreement appear in findings 11 and 12. They provide for license fees payable to the Urquharts of 15 percent of the net selling prices of all foam producers and foam stabilizers sold by the manufacturer throughout the life of the patents. Each of these agreements specifies that the Urquharts granted to any purchaser of foam producers from the manufacturer—

"* * * a non-exclusive license under said Patents during the term of said Patents or either of them to use said Foam Producers with Foam Stabilizers upon which license fees are paid by or in behalf of the purchaser to The Urquharts, in the practice in the United States of the processes of making foam covered by said Patents or either of them."

These agreements were further implemented by two license notices based on drafts prepared by the Urquharts' counsel. These licenses are exemplified by the following notices which were used by the National Company on its containers of foam stabilizers and foam producers, respectively:

"National "Aer-O-Foam" liquid contained herein is useful in the generation of foam in accordance with the processes protected by the following patents

"U. S. No. 2106043
"U. S. No. 2198585

"A part only of a fair consideration for a license to practice the processes of said patents, until the contents are consumed has been included in the purchase price of this product. The consideration so included entitles the purchaser to use said liquid until consumed in producing foam by means of apparatus on which has been paid the remainder of a fair consideration for the right to practice the processes of said patents.

"* * * * * *

"This National "Aer-O-Foam" Nozzle foam producer is useful in the production of foam in accordance with the processes protected by the following patents:

"United States No. 2,106,043
"United States No. 2,198,585

"A part only of a fair consideration for a license to practice the processes of said patents for the period of the normal life of said foam producer has been included in its purchase price. The consideration so included entitles the purchaser to use it in producing foam from stabilizers on which has been paid the remainder of a fair consideration for a license to produce foam by said processes until consumption thereof."

The other licensing plan of the Urquharts was a direct license to the ultimate user and was known as "a consumer's license". Subsequent to September 30, 1947, a direct consumer license form was printed and

has been in existence in the Urquharts' files. The pertinent portions of this license agreement, which is rather lengthy in character, are set forth in detail in finding 15. In this agreement, which was to be between an ultimate user and the Urquharts, the license fee to be paid by the consumer to the Urquharts on the unpatented foam-forming material, however or wherever obtained, was 10 cents a pound unless purchased from an appointed manufacturer.

We next make a comparison of the royalty rates in the two different licensing plans. In the 1947 catalog of the National Foam System, Inc., the price per gallon of the unpatented foam-forming material or stabilizer in lots of less than 100 gallons is listed as $4.50 per gallon; in lots of 100–199 gallons, $4 per gallon, and in lots of 200 or more gallons, $3.80 per gallon. According to the manufacturers' agreement, the net license fee of 15 percent paid to the Urquharts as applied to these three prices would be $0.6750, $0.60 and $0.57 per gallon, respectively. The parties have stipulated that the foam-forming material sold by the National Company weighed 9.4 pounds per gallon, and by the use of such conversion figure the consumer's license at 10 cents per pound calls for a license fee of a straight $0.94 per gallon for this unpatented material. It therefore follows that anyone operating under a direct consumer license would be required to pay a higher royalty on the stabilizer to practice the patent than one who acquires a license by purchasing this material from an Urquhart-appointed manufacturer.

A license notice was printed on the back of the invoices for sales by the National Company of foam stabilizers and foam producers. This license notice concludes with the following sentence:

"Consumer licenses to use the processes of the foregoing patents upon payment of fair license fees with apparatus, chemicals and stabilizers however obtained are available upon application through us."

Dollar volume of sales of stabilizers and equipment by the National Company within the six years preceding the filing of the petition in this case had been in the relationship of approximately 75 percent stabilizer to 25 percent equipment.

It would obviously be adverse to the interest of an appointed manufacturer to negotiate a direct license between a consumer and the Urquharts, and there is no evidence that any consumer license for the use of the two patents in suit was ever requested from the Urquharts or ever executed.

By their two licensing plans involving different royalty rates, the Urquharts have created two different classes of customers, one favored over the other in the purchase of unpatented materials, and have enlarged the monopoly of the patents beyond their legal scope by channeling trade in unpatented materials through their appointed manufacturers. At no time under the direct consumer license would it have been possible for a purchaser who desired to buy unpatented stabilizer from a competitor of the Urquharts' appointed manufacturers, to do so except on royalty terms less favorable to him.

The Urquharts have attempted to justify the higher royalty rate by contending that they intended to furnish additional services, such as those of an engineering nature and "know-how," in addition to a license. This contention is clearly inconsistent with the phraseology of the consumer license, plaintiff's exhibit 14, which specifically sets forth that the license fees are "for the practicing of said processes," the consumer license further providing in paragraph 8 thereof, that—

"The Urquharts do not guarantee the working or performance of any processes hereby licensed or the working or performance of any Foam Producers, their sole relationship to the business being that of licensor of the patent rights."

Also, assuming that an individual was operating under the consumer license and merely desired to replenish a supply of stabilizer, under plaintiff's contention each time he did so he would be paying unnecessarily for engineering services and "know-how."

One of the leading cases dealing with a like situation is Carbice Corp. v. American

Patents Development Corp., 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819. The patent there in suit was directed to a transportation package consisting of a shipping box or carton in which ice cream or other foodstuffs could be shipped and in which was also placed a small container holding a quantity of solid carbon dioxide, popularly known as "Dry Ice." The "Dry Ice" was supplied by an exclusive licensee of the American Patents Development Corporation known as the Dry Ice Corporation, which manufactured the solid carbon dioxide. The Carbice Corporation also manufactured solid carbon dioxide and was charged with contributory infringement because it sold this product to customers of the Dry Ice Corporation with knowledge that the dioxide was to be used by the purchaser in transportation packages like those described in the patent. The Supreme Court said, 283 U.S. at pages 33 and 34, 51 S.Ct. at page 336:

"* * * The Dry Ice Corporation has no right to be free from competition in the sale of solid carbon dioxide. Control over the supply of such unpatented material is beyond the scope of the patentee's monopoly; and this limitation, inherent in the patent grant, is not dependent upon the peculiar function or character of the unpatented material or on the way in which it is used. Relief is denied because the Dry Ice Corporation is attempting, without sanction of law, to employ the patent to secure a limited monopoly of unpatented material used in applying the invention. * * *"

Another case in point is that of Leitch Manufacturing Company v. Barber Company, 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371. The Barber Company and the Leitch Manufacturing Company were competing manufacturers of a bituminous emulsion which was an unpatented stable article of commerce. Such emulsion was used by builders of roads as a coating. The Barber Company acquired the process patent sued upon and sought to use it to secure a limited monopoly in the business of producing and selling the bituminous material for practicing and carrying out the patented method. The company itself did not engage in road building or competing with road contractors. The Barber Company sued the Leitch Manufacturing Company as a contributory infringer. The Supreme Court stated, 302 U.S. at pages 461 and 463, 58 S.Ct. at page 290:

"That the patent did not confer upon the Barber Company the right to be free from competition in supplying unpatented material to be used in practicing the invention was settled by the rule declared in the Carbice Case. * * * The Court held in the Carbice Case that the limitation upon the scope or use of the patent which it applied was 'inherent in the patent grant.' It denied relief, not because there was a contract or notice held to be inoperative, but on the broad ground that the owner of the patent monopoly, ignoring the limitation 'inherent in the patent grant,' sought by its method of doing business to extend the monopoly to unpatented material used in practicing the invention. By the rule there declared every use of a patent as a means of obtaining a limited monopoly of unpatented material is prohibited. It applies whether the patent be for a machine, a product, or a process. It applies whatever the nature of the device by which the owner of the patent seeks to effect such unauthorized extension of the monopoly. * * *"

In Pyrene Mfg. Co. v. Urquhart, 69 F. Supp. 555, at pages 560 and 561, involving the same two patents now before us, the District Court for Eastern District of Pennsylvania said:

"The Urquharts have adopted and have stated their purpose to adhere to a policy which discriminates between users of the process who buy stabilizer from the manufacturing licensees and users who buy it elsewhere. If and when any non-manufacturing would-be user, who expects to buy his stabilizer in the general market, applies direct to the Urquharts for a license to use the

process, he will be charged a royalty which, other things being equal, will make it more expensive for him than for those who have obtained licenses by purchasing from the manufacturing licensees. The discrimination involved is, not as the Urquharts appear to view it, between manufacturers and users but between two classes of users. The effect of the discrimination is to limit free competition in the stabilizer field by penalizing users who buy from all except certain manufacturers. * * * In other words, the Urquharts have the intention (and the power if their patents are valid) to use their patents to interfere with free competition in unpatented stabilizer. That the law forbids. This announced policy may or may not be the reason why no prospective users have applied to the Urquharts for licenses, but it is not necessary that such be the fact. The rule against misuse of the patent monopoly is based on the policy of the anti-trust laws and these laws forbid an agreement or conspiracy in restraint of commerce, whether followed by overt acts carrying it into effect or not. * * *

"I, therefore, hold that in the present case the Urquhart counterclaim is barred by reason of the misuse of the patents. * * *"

Also, in National Foam System, Inc., v. Urquhart, 103 F.Supp. 433, at page 435, which case involved the same patents and the same licensing plans of the Urquharts now before us, the District Court for the Eastern District of Pennsylvania, after reviewing the same facts which we have set forth, stated:

"In the Pyrene case (Pyrene Mfg. Co. v. Urquhart), D.C., 69 F.Supp. '555, this Court held that the license agreement was invalid because of misuse of the patent in connection with the sale of unpatented stabilizer. The Court of Appeals, in its final opinion, refrained from passing upon the question. However, I have not found anything in this record to change my view."

Because of misuse of the patents, the plaintiff is not entitled to recover and his petition is therefore dismissed.

It is so ordered.

JONES, Chief Judge, and MADDEN, WHITAKER and LITTLETON, Judges, concur.