[Civ. No. 15461. First Dist., Div. One. June 29, 1953.]

FRUIT MACHINERY COMPANY (a Corporation), Respondent, v. F. M. BALL AND COMPANY (a Corporation), Appellant.

C. P. Door and Otto C. Stelling for Appellant.

Cooley, Crowley & Gaither for Respondent.

WOOD (Fred B.), J.—This is an action in contract for royalties payable by defendant to plaintiff in 1949 and 1950 according to the terms of an agreement by which plaintiff (licensee of the patentee) granted defendant a ''non-exclusive sub-license to construct, manufacture, own, use and maintain 125 F. & P. Pitters'' (patented peach pitting machines) under the terms and conditions expressed in the agreement.

Judgment was rendered in favor of plaintiff in the sum of $10,335.08 with interest at 7 per cent from September 15, 1949, and in the sum of $23,906.25 with interest at 7 per cent. Defendant has appealed.

## THE ISSUES

Defendant claims it is absolved from the duty of paying any of the agreed royalties because (1) defendant acquired and had title to the machines, (2) there was no consideration for payment of the royalties, and (3) plaintiff is a monopoly and in restraint of trade under state and federal statutes.

■■ Findings of fact and conclusions of law were waived. Accordingly, a reviewing court ''will assume that the trial court found every fact essential to support the judgment, and when a transcript of the evidence is before the reviewing court it will not weigh the evidence to determine what is true and what is not, but it will search the record for the purpose only of determining whether there is substantial evidence supporting the judgment and will resolve all doubts

in favor of the judgment. [Citations.]" (*Baker* v. *Baker*, 98 Cal.App.2d 424, 426 [220 P.2d 576].)

Our examination of the record in this case convinces us that defendant's points are not well taken; instead, that the evidence supports implied findings which in turn support the judgment.

## THE FACTS

The record shows the significant facts narrated below. Some were admitted by the answer to the complaint, expressly or by failure to deny. Some were established by stipulation. The rest were supported by substantial evidence.

Filice and Perrelli Canning Company, Inc., a corporation, acquired an invention known as F. & P. Pitters (machines for removing pits from peaches) and all rights and patents to be granted thereon.

Filice and Perrelli contacted five other canning companies, including the defendant herein, to form a corporation to develop and market the pitter. That corporation, the plaintiff herein, was organized in January, 1942. Among its purposes were these: (a) dealing in patent rights and licenses relating to F. & P. Pitters, (b) improving and developing F. & P. Pitters, and (c) licensing F. & P. Pitters to the six canning company organizers and others. The intention of the organizers also was that the plaintiff should make a profit from the manufacture of the machines and the licensing of the machines to themselves and others, and that they would profit through dividends payable to them as stockholders; not that plaintiff should operate on a nonprofit basis, as defendant now contends.

In February, 1942, Filice and Perrelli granted to plaintiff an exclusive license (during the pendency of the patent application and during the life of any patent which might issue) to manufacture F. & P. Pitters and to lease the same to others for use, and to grant sublicenses, for such consideration or royalties as would be determined by plaintiff's board of directors. This agreement stipulated that plaintiff would pay Filice and Perrelli royalties on fruit pitted by users of these machines, beginning at 10 cents per ton during the first year of the license and increasing year by year until the fifth year, during which, and thereafter, the royalty would be 30 cents per ton. Plaintiff further agreed not to assign this license or any interest therein without the written consent of Filice and Perrelli. (This agreement did not au-

thorize plaintiff to sell any of the machines which it might manufacture.)

At all times the six organizers, including defendant, were represented upon plaintiff's board of directors.

During the development period each of the organizers contributed moneys in equal amounts to plaintiff for the cost of perfecting the machine. Commencing at least as early as November, 1943, one T. M. Harrer did the development work for plaintiff, including the making of arrangements for manufacture on a commercial scale. Early in the history of the plaintiff corporation Harrer was given representation upon its board of directors. He continued thereafter to be represented thereon.

By the fall of 1945 the pitter was sufficiently improved for plaintiff to manufacture machines for use in 1946. Accordingly, the six canner organizers indicated to plaintiff the number of machines each would want for use during the 1946 season, a total of 225 machines.

At meetings held in September, October, November, 1945, and January and March, 1946, plaintiff's board of directors considered ways and means of financing the cost of building these machines, financing plaintiff's operations, and paying the 30 per cent royalty to Filice and Perrelli. In December, 1945, a written contract between plaintiff and Harrer was executed, whereby he would make the machines and plaintiff would pay him the actual cost plus a percentage. To meet that cost, various proposals were considered: To sell the machines to the six canner members on a conditional sales contract basis, and hypothecate the contracts to plaintiff's bank; to impose a royalty of $1.00 per ton on the use of such machines; and to sell capital stock to the six canner members, in equal amounts, and to issue an equal share to Harrer as compensation for his work of development. This culminated in the following arrangement: Harrer would bill plaintiff from time to time during the course of manufacture and plaintiff would then bill each of the six canner members for its due share of the cost, based upon the number of machines it had requested; in addition, each canner member would annually pay plaintiff a royalty (to be determined by plaintiff's board of directors) on the machines taken by him, based upon the tonnage of fruit processed by him, and to do so during the life of the patent (until 1960). Plaintiff desired to have this arrangement or plan expressed in the form of written contracts between it and the canner members. Its

board instructed plaintiff's secretary to prepare contracts to cover the sale of the machines and the royalties thereon and to submit them with stock subscription forms to the six interested canners with a letter advising them their orders would be taken for the number of machines indicated. But it was understood by all concerned that plaintiff would have to obtain from Filice and Perrelli a modification of the licensing agreement because that agreement did not authorize plaintiff to convey title to any machine. Such a modification was effected in May, 1947.

Meanwhile, the machines were manufactured and delivered, under this arrangement, to the several canner members during 1946, defendant receiving and paying the cost of 110 to 125 machines, making progressive payments as the machines were manufactured. Each of the canner members, including defendant, also paid plaintiff the 1946 royalty, 75 cents per ton of fruit processed on these machines. During 1946, capital stock of the plaintiff was issued in equal amounts to the several canner members, including defendant, and to Harrer.

In May, 1947, Filice and Perrelli executed with plaintiff a modification agreement supplemental to the licensing agreement of 1942. The 1947 agreement recites that the 1942 agreement made "no provision authorizing the sale of any machines constructed" thereunder and it is the desire of the parties that the 1942 agreement "be modified to authorize the licensee [plaintiff herein] . . . to sub-license the right to manufacture said machines and *to permit the ownership by such sub-licensees* of certain of said machines *upon the payment of royalties for the permission to so manufacture, own, and use,* as hereinafter detailed." (Emphasis added.)

By the terms of this supplemental agreement Filice and Perrelli granted plaintiff the right to license defendant and the other canner stockholders (naming each) "to manufacture, own, use and maintain F. & P. PITTERS in the numbers set forth opposite their names" (125 being the number in each case), reciting that all of said companies "are present stockholders of" plaintiff. The agreement provided (1) that the licenses granted said companies "shall provide for the payment of royalties for the right to manufacture, own, and use said machines, in an amount to be determined by the Second Party [plaintiff herein], but in no event to be less than THIRTY CENTS (30¢) per ton for each ton of fruit processed through said machines for the remainder of the life of the" patents; (2) [a] that plaintiff "shall by appropriate

agreement forbid the resale of said machines by any of the above named companies, except as hereinafter provided, and shall forbid the use thereof in canneries other than those owned or operated by said above named companies. [b] This paragraph shall not prevent the use or sale of said machines licensed to any of the above named companies by or to a wholly owned subsidiary, or by or to a parent company holding all or substantially all of the outstanding stock of one of the above named companies, or by or to an affiliated company in which all or substantially all of its capital stock is owned by a parent company which, in turn, owns all or substantially all of the capital stock of one of the above named companies''; (3) that in sublicensing ''the manufacture, ownership and use of said machines, as herein provided'' plaintiff ''shall at all times restrict the ownership, use and sale of said machines, as above set forth, and provision shall be made in the sub-license agreements to afford Second Party a prior option to purchase said machines from any of said purchasers or subsidiaries, affiliates or parent companies in the event any of said sub-licensees above named shall dispose of its stock in Second Party. Second Party shall require in all such sub-license agreements that it be given a prior option to purchase said machines in the event any owner of said machines desires to sell them to a person or firm other than a parent, subsidiary or affiliate as described above''; (4) that if any of the machines manufactured by virtue of such sublicenses be destroyed by fire or otherwise, plaintiff shall have the privilege of granting a new license to the company suffering such loss ''so that such company may have a total of ONE HUNDRED TWENTYFIVE (125) machines under said license''; (5) that the provisions of all sublicense agreements covering machines to be manufactured as contemplated by this agreement ''shall first be subject to the written approval of'' Filice and Perrelli before any such sublicense agreement is finally entered into; (6) that plaintiff shall at all times be obliged to account to Filice and Perrelli for the royalties provided in the licensing agreement of 1942 ''for all fruit processed through all machines sub-licensed by Second Party [plaintiff] in the manner contemplated herein'' and plaintiff agrees in each sublicensing agreement to make such provision as will at all times enable plaintiff to comply with this requirement; and (7) that the period covered by the supplemental agreement shall be coextensive with that of the original agreement of 1942.

During the first part of 1947 it was agreed between the six canners individually and with plaintiff that six identical, written instruments be prepared embodying the terms of the oral agreement, and that all of the canner members were to sign these identical, written instruments and that all of the six canner members were to be bound thereby. Five, including defendant, signed those instruments. The sixth canner later executed a substantially similar instrument with plaintiff.

The instrument executed by defendant with plaintiff bears date July 29, 1947.* It is an agreement which recites that plaintiff is exclusive licensee for the manufacture of pitter machines identified by reference to patents issued in 1942 and 1943, and refers to the original and supplemental licensing agreements of 1942 and 1947 between plaintiff and Filice and Perrelli. It then provides that plaintiff grants unto defendant a nonexclusive sublicense "to construct, manufacture, own, use and maintain 125 F. & P. Pitters, embodying the principles and improvements thereon, under the following terms and conditions": (1) Defendant shall not use the machines in any cannery other than one owned or operated by defendant, except by a subsidiary or parent company (the exception being expressed in the very terms which appear in subclause (b) of clause (2) of our summary of plaintiff's 1947 supplemental agreement with Filice and Perrelli); (2) defendant agrees to pay plaintiff a royalty "for the right to manufacture, own and use said machines in such amount as is determined from time to time by" plaintiff, "but in no event shall said royalty be less than 30 cents per ton for each ton of fruit processed through said machines for the life of the patent period . . . ," said royalty to be paid "on the use of the machines from date hereof until . . . December 7, 1960"; (3) if defendant disposes of its shares of stock in plaintiff, plaintiff shall have the prior right and option forthwith to buy the machines then owned by defendant, the purchase price to be "the depreciated value thereof on the books of" defendant at the time the right to purchase accrues to plaintiff; (4) if defendant desires to sell the machines other than to a parent, subsidiary or affiliate,

---

*When this agreement had been drafted and was ready for execution, plaintiff sent copies to the several canner-stockholders for signature. The letter of transmittal stated "you will find enclosed, in duplicate, the sublicense agreement covering the 125 machines to which you may take title."

plaintiff shall be given a prior option to purchase, the price to be the original cost less 1/13 thereof for each calendar year after the year of manufacture; (5) defendant shall account to plaintiff on Tuesday of each week for all royalties that may be due or owing, covering tonnage processed during the preceding week, and to determine the tonnage processed defendant's books and records shall be open to plaintiff's inspection at all reasonable times; (6) if any of the machines manufactured by virtue of this sublicense are destroyed by fire or otherwise, defendant shall be privileged to construct additional machines so that defendant may at all times have 125 capable of operation under this sublicense; (7) neither this agreement nor any of the rights of defendant hereunder shall be assigned by defendant without the prior written consent of plaintiff.

After supplying the canner-stockholder demand for machines (not exceeding 125 each), pursuant to these agreements, plaintiff built machines for leasing only. The royalty on leased machines is maintained at a higher rate than on canner-stockholder owned machines.* The difference in rate is in consideration of the fact that each machine cost the canner-stockholder about $1,300 to build, and the canner-owner maintains the machine, replacing parts, at its own expense, and runs the risk of obsolescence due to possible improvements in this or in plaintiff's competitors' machines. In contrast, in respect to machines which it leases, plaintiff pays the manufacturing cost and the cost of upkeep, and runs the risk of loss of the investment through obsolescence. These facts would support an inference that a higher royalty rate for leased machines would be just and fair. That the higher rates actually fixed for leased machines bore a reasonable relation to these factors is indicated by the fact that one of plaintiff's stockholders contracted with plaintiff in 1948 to lease or buy, intending to lease on a royalty basis of $4.25 per ton, with a minimum of 100 tons per year. It preferred leasing, with higher royalties, to making the capital investment and paying lower royalties.

---

*The royalty rates fixed for plaintiff's leased and the canner-stockholder owned machines, respectively, were $1.50 and $2.50 per ton in 1947; $3.25 and $4.25 in 1948; $2.25 and $4.25 in 1949, 1950, and 1951. Uniformly for both types of machines, a minimum payment based upon 100 tons per machine per year has been required, except in 1950, when the minimum base was lowered to 85 tons because of a government order requiring the growers to drop 15% of the crop on the ground.

Plaintiff charged its stockholders the same royalty rate on machines leased to its stockholders as on those leased to others. Defendant leased 65 machines for a time. It desired to buy but it already had its 125 as limited by its agreement and by the 1947 agreement between plaintiff and Filice and Perrelli.

Plaintiff has endeavored to lease machines to others in the industry but has not met with great success, due to improvements in its competitors' machines, such as automatic feeding devices, which plaintiff was still seeking to develop at the time of trial.

In 1948 a dispute arose between defendant and plaintiff concerning (a) the royalties on 65 machines defendant had leased from plaintiff, and (b) the rate fixed by plaintiff in March of 1948 on canner-owned machines. This was the subject of considerable discussion at meetings of plaintiff's board of directors during the latter months of 1948 and culminated in plaintiff's giving defendant a credit of $11,000 on account and defendant's paying the 1948 royalties on its 125 machines. Upon this appeal, the parties differ upon the question whether or not the $11,000 credit operated as consideration for an obligation on the part of defendant to pay the royalty rates on its 125 machines in 1949 and 1950. That question does not appear especially significant in view of the obligation which defendant assumed when it executed the sublicense agreement with plaintiff in July, 1947.

Each of the canner-stockholders, including defendant, paid the royalty rates fixed by plaintiff's board of directors for the years 1946 to 1948, inclusive. All canner-stockholders except defendant paid the royalties for 1949 and 1950, defendant paying none for 1950 and only in part for 1949.

DISCUSSION OF THE ISSUES

(1) *Acquisition of title to the machines did not prevent defendant from effectively assuming the obligation to pay the royalties.*

Defendant contends that the oral agreement of 1945 became an executed oral contract by which defendant became the owner of 125 machines; that this was confirmed in writing by the supplemental licensing agreement of May, 1947, between plaintiff and the patentee and the sublicensing agreement of July, 1947, between plaintiff and defendant; and that there can be no dispute of the fact that in 1949 and 1950 defendant owned those machines.

Defendant then invokes a number of decisions of the Supreme Court of the United States,* some of which apply and others recognize the principle that when a patentee sells his patented article, vesting absolute title in the purchaser without condition or restriction, the article passes from without the scope of the patent and the purchaser may make the same unrestricted use of it as he could of an unpatented article. That is a well established principle but it does not apply here.

The fallacy of defendant's reasoning stems from its erroneous interpretation of the oral and written agreements mentioned and from its attempt to separate its acquisition of a limited title and right of dominion over these machines from the other features of those agreements.

The oral and written agreements warrant a finding of intent that defendant should not acquire, and that it did not acquire a proprietary interest in any of the 125 machines until after appropriate modification of plaintiff's 1942 licensing agreement with the patentee and the execution of a sublicensing agreement expressive of appropriate terms and conditions, including an obligation to pay royalties.

Scrutiny of the July, 1947, sublicensing agreement demonstrates that the "title" which defendant acquired was severely limited in nature, both as to the use of those machines and the power to dispose of them, and was coupled with the obligation to pay the indicated royalties, all tied in with the patent, through plaintiff as exclusive licensee and approval by the patentee, and limited to the life of the patent. The various provisions of defendant's sublicensing agreement are interlaced, interwoven, and bound together. Defendant cannot take the privileges thereby accorded without the obligations imposed and assumed.

Clearly, it is a contract made by plaintiff (as assignee of the patentee) in the exercise, and within the scope, of the rights given and the protection accorded by the patent. It is within the scope and application of the principle enunciated by the Supreme Court of the United States in 1926: "The

---

*Bloomer v. McQuewan, 55 U.S. 539 [14 L.Ed. 532]; Chaffee v. Boston Belting Co., 63 U.S. 217 [16 L.Ed. 240]; Bloomer v. Millinger, 68 U.S. 340 [17 L.Ed. 581]; Mitchell v. Hawley, 83 U.S. 544 [21 L.Ed. 322]; Adams v. Burke, 84 U.S. 453 [21 L.Ed. 700]; Morgan Envelope Co. v. Albany etc. Paper Co., 152 U.S. 425 [14 S.Ct. 627, 38 L.Ed. 500]; Keeler v. Standard Folding Bed Co., 157 U.S. 659 [15 S.Ct. 738, 39 L.Ed. 848]; United States v. General Elec. Co., 272 U.S. 476 [47 S.Ct. 192, 71 L.Ed. 362]; United States v. Univis Lens Co., 316 U.S. 241 [62 S.Ct. 1088, 86 L.Ed. 1408].

owner of a patent may assign it to another and convey, (1) the exclusive right to make, use and vend the invention throughout the United States, or, (2) an undivided part or share of that exclusive right, or (3) the exclusive right under the patent within and through a specific part of the United States. But any assignment or transfer short of one of these is a license, giving the licensee no title in the patent and no right to sue at law in his own name for an infringement. [Citations.] ██ Conveying less than title to the patent, or part of it, the patentee may grant a license to make, use and vend articles under the specifications of his patent for any royalty or upon any condition the performance of which is reasonably within the reward which the patentee by the grant of the patent is entitled to secure. ██ It is well settled, as already said, that where a patentee makes the patented article and sells it, he can exercise no future control over what the purchaser may wish to do with the article after his purchase. It has passed beyond the scope of the patentee's rights. [Citations.] But the question is a different one which arises when we consider what a patentee who grants a license to one to make and vend the patented article may do in limiting the licensee in the exercise of the right to sell. The patentee may make and grant a license to another to make and use the patented articles, but withhold his right to sell them. The licensee in such a case acquires an interest in the articles made. He owns the material of them and may use them. But if he sells them, he infringes the right of the patentee, and may be held for damages and enjoined. ██ If the patentee goes further, and licenses the selling of the articles, may he limit the selling by limiting the method of sale and the price? We think he may do so, provided the conditions of sale are normally and reasonably adapted to secure pecuniary reward for the patentee's monopoly. One of the valuable elements of the exclusive right of a patentee is to acquire profit by the price at which the article is sold. The higher the price, the greater the profit, unless it is prohibitory. When the patentee licenses another to make and vend, and retains the right to continue to make and vend on his own account, the price at which his licensee will sell will necessarily affect the price at which he can sell his own patented goods. It would seem entirely reasonable that he should say to the licensee, 'Yes, you may make and sell articles under my patent, but not so as to destroy the profit that I wish to obtain by making them and selling them myself.' He

does not thereby sell outright to the licensee the articles the latter may make and sell, or vest absolute ownership in them. He restricts the property and interest the licensee has in the goods he makes and proposes to sell." (*United States* v. *General Elec. Co.*, 272 U.S. 476, 489-490 [47 S.Ct. 192, 71 L.Ed. 362].)

Defendant directs attention to the fact that its 1947 agreement is a sublicense "to construct, manufacture, own, use and maintain 125 F. & P. Pitters," and argues that because plaintiff built these machines (defendant reimbursing plaintiff for the actual cost), the right to "own and use" is in some way separated from the right to "construct and manufacture." This is but a part of defendant's attempt to divide its contract into separate and severable parts. True, plaintiff did build these machines. We must view that against the background of plaintiff as a corporation organized and financed by defendant and the other canners to develop and exploit the invention. Payment of the cost of manufacture of the machines presently coming into their possession (in 1945 and 1946) was a part of their method of financing. The limited right of manufacture later accorded in 1947 was in a very real sense confirmation of the 1945-1946 transaction. Besides, defendant may yet have occasion to "manufacture" machines to replace any of the original 125 which may be "destroyed by fire or otherwise." These facts do not tend to render severable any of the provisions of defendant's sublicense agreement of July, 1947.

▇ (2) *Defendant's obligation to pay the royalties is supported by adequate consideration.*

Defendant's argument that its promise to pay these royalties was without consideration is much the same as its argument that it acquired dominion over the 125 machines divorced from restrictions as to their use or disposition.

Here, it directs particular attention to the provision of the sublicense agreement which (a) declares that if defendant desires to sell any of these machines other than to a subsidiary, parent or affiliate of defendant, plaintiff has a prior option to buy, and (b) fixes the price, defendant's original cost less 1/13 thereof for each calendar year since the year of manufacture. Defendant then says that in such event (plaintiff failing to exercise its option) the machines so sold by defendant will pass beyond the scope of the monopoly accorded by the patent and the purchaser will be entitled to use the machines without the payment of royalties. Therefore, the argu-

ment runs, defendant need not pay the royalties it has promised to pay.

The mere statement of this argument constitutes its own refutation. The event described has not happened yet. It is not likely to happen in view of the diminishing price defendant would receive and the desire plaintiff would have to keep the machines within the scope of the patent. Should such an event hereafter occur, we see no reason for holding that it would operate retroactively to void the element of consideration for defendant's promise to pay royalties which had theretofore accrued. Nor would the bare possibility of such an occurrence absolve defendant from its obligation to pay the royalties while it continues to hold these machines under and pursuant to the terms and conditions of the sublicense agreement.

Moreover, the burden of showing want of consideration rests upon defendant (Civ. Code, § 1615), a burden it has failed to meet. Also, this is a written instrument, which "is presumptive evidence of consideration." (Civ. Code, § 1614.)

■ (3) *Plaintiff and its canner-stockholders, including defendant, have not "created a monopoly by the limitation of the ownership of the peach pitting machines to the six stockholders," in violation of state or federal law, and thereby rendered defendant's sublicensing agreement void and unenforceable.*

Defendant says that (1) "in order to permit the canners who had contributed to the research work on the machines to secure 'an advantage'," (2) "arrangements were made to allow them to purchase outright a limited number of machines," (3) by "a combination participated in by the stockholder members of" plaintiff, the exclusive licensee of the patentee, "a setup has been created whereby the stockholder members have an exclusive monopoly on the ownership of machines by canneries while all other canners can only secure machines on a royalty basis"; (4) plaintiff's sole competitor "only leases machines and does not sell them"; (5) "a complete monopoly, therefore, exists in the six canners so far as owning machines is concerned, and the whole canning world other than these six must lease machines and pay royalties therefor"; and (6) it is possible that in time plaintiff will reduce the royalty rate on canner-owned machines to 30 cents per ton and continue to maintain the $4.25 per ton rate on leased machines.

This argument ignores substantial evidence that the purpose of allowing canner ownership of a limited number of machines was that of financing the mechanical and commercial development of the invention, not that of giving anyone an "advantage"; that the ownership accorded was not "outright" but was severely limited and within the scope of the patent right; and that the differential in royalty rates which plaintiff has maintained between the leased and canner-owned machines bears a reasonable relationship to the differences in costs and capital risks between the two types of uses, thus not giving the canner-owners the "advantage" which defendant asserts but has not proven.

As to the possibility of plaintiff's spreading the differential to such an extent as would put the arrangement beyond the scope of the patent rights and within the proscription of the antitrust laws, a sufficient answer is that such has not happened yet, and we read into the license and sublicense agreements no intendment that plaintiff, in fixing rates from time to time, should or could establish such a differential as would lose to the parties the privileges, the sanctions and the protection accorded by the patent law and subject them to the proscriptions and penalties of the antitrust laws. Future violation of these agreements and of the antitrust laws will not be presumed. Such a violation of the agreements and of the law, should it occur, would subject the violator to appropriate remedies at the suit of interested parties and of the government. It would not of itself abrogate the contract and render obligations under it illegal and void.

We do not mean that it would be legally improper or incompetent for the patentee, his exclusive licensee, and the latter's sublicensees, by agreement such as these parties have made, to give themselves a commercial advantage over others in industry. ■ The very purpose of the patent law is to encourage inventive effort by according the inventor and his assigns control over the invention and protection in the exercise of the rights accorded him as patentee. Defendant has not shown that the parties, in executing and carrying out the sublicense agreement in suit, exercised rights or powers not accorded them by the patent law or abused any rights or powers accorded them by that law.

In support of its argument on this point defendant cites a number of antitrust law decisions. We deem them inapplicable. The greater number of them dealt with situations in which no patent rights were involved. In those in which

the exercise of patent rights was involved, it appeared that the patentee or his assignee went beyond that which was necessary or incidental to the scope of his patent and brought himself within the proscription of the antitrust laws. In the latter group are *Standard Sanitary Mfg. Co. v. United States,* 226 U.S. 20 [33 S.Ct. 9, 57 L.Ed. 107]; *Ethyl Gasoline Corp. v. United States,* 309 U.S. 436 [60 S.Ct. 618, 84 L.Ed. 852]; *United States v. Univis Lens Co.,* 316 U.S. 241 [62 S.Ct. 1088, 86 L.Ed. 1408]; *Oxford Varnish Corp. v. Ault & Wiborg Corp.,* 83 F.2d 764; *Urquhart v. United States,* 109 F.Supp. 409. *Morey v. Paladini,* 187 Cal. 727 [203 P. 760], involved illegal restraint of trade in the buying and selling of lobsters, not a patented article. *Speegle v. Board of Fire Underwriters,* 29 Cal.2d 34 [172 P.2d 867], came up on a demurrer which, of course, admitted the allegations of the complaint concerning an asserted combination between a board of fire underwriters and insurance company members of the board to stifle competition in the insurance field by dominating the business of insurance agents. *United States v. United Shoe Machinery Corp.,* 110 F.Supp. 295, involved much more than the mere exercise of patent rights and their protection. (See the summary on page 297.) Indeed, the major patents had expired. (P. 339.) Interestingly enough it was held therein that the defendant's tanning machine leases did not violate the Sherman Act for the reason that there was no evidence that defendant had dominant market power or planned to monopo lize in that field, the court saying, "the leases themselves are not forbidden; only when they are used as an instrument for seeking market control is the lessor to be charged with using them in an attempt to monopolize. Such use of tanning machinery leases was not proved." (P. 346.)

The judgment is affirmed.

Peters, P. J., and Bray, J., concurred.