## NATIONAL FOAM SYSTEM, Inc. v. URQUHART.

### No. 10746.

United States Court of Appeals Third Circuit.

Argued Nov. 20, 1952.

Decided March 13, 1953.

Rehearing Denied April 7, 1953.

D. C., C. Brewster Rhoads, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., on the brief), for appellant.

Laurence H. Eldredge, Philadelphia, Pa. (John Ross, Charles C. Norris, Jr., Norris, Lex, Hart & Eldredge, Philadelphia, Pa., on the brief), for appellee.

Before McLAUGHLIN, KALODNER and STALEY, Circuit Judges.

McLAUGHLIN, Circuit Judge.

Plaintiff obtained a declaratory judgment in the district court which invalidated a written non-exclusive license agreement between the parties and defendant appeals. Jurisdiction is based on diversity, plaintiff being a Delaware corporation while defendant is a resident of Pennsylvania.

The agreement was dated April 15, 1941. It concerned two patents covering apparatus and process for generating and throwing fire extinguishing foam.[1] In it appellant, Radcliffe Morris Urquhart, and his brother, George Gordon Urquhart, who originally had been a co-defendant in this action but who assigned all his right, title and interest to these patents and to past and future infringement actions thereon to appellant after the institution of this suit, as owners of those patents covenanted that they had the exclusive rights to bring suits for infringement of the patents. They also covenanted that they would not sue appellee for infringement. They granted to any purchaser of the foam producer[2] from appellee a non-exclusive license to use it in consideration of appellee paying them 15% of the net selling price of "* * * all Foam Producers and Foam Stabilizers[3] sold by * * *" appellee in the United States during the life of the patents. Dollar volume sales of stabilizer were approximately three times those of foam producers.

The parties functioned under the agreement until shortly after our decision in Pyrene Mfg. Co. v. Urquhart, 3 Cir.,

J. Matthews Neale, Washington, D. C. (Strauch, Nolan & Diggins, Washington,

1. For convenience we shall refer to these patents as the "mechanical foam patents" to distinguish them from earlier "chemical foam patents."

2. Defined in the agreement as including both the apparatus and process patents.

3. "Foam Stabilizers" refers to the unpatented foam promoting substances used in the production of any of the processes of the patents.

1949, 175 F.2d 408, certiorari denied 338 U.S. 826, 70 S.Ct. 73, 94 L.Ed. 502, which affirmed the district court[4] in holding the patents in question to be invalid. Within two months of the filing of that opinion this suit was started. The facts were stipulated and, following argument in December, 1951, an opinion was filed by Chief Judge Kirkpatrick on January 18, 1952, with final judgment in favor of the plaintiff entered February 28, 1952. By the judgment the agreement was invalidated for two reasons: First, because of total failure of consideration as a result of the Pyrene opinion and, second, because of the defendant's misuse of the patents by means of the agreement.

■ As to whether the Pyrene decision resulted in a failure of consideration, the parties agree that the law of Pennsylvania is controlling. We are persuaded by an examination of the Pennsylvania decisions that the question presented, whether a non-exclusive license is terminated for failure of consideration when the underlying patent is declared invalid, has not been resolved by that jurisdiction. Edison General Electric Co. v. Thackara, 1895, 167 Pa. 530, 31 A. 856, would seem to support appellee's position, but is not close enough to the present factual situation to be reliable. On the other hand, the recent opinion of Judge Gordon in the Philadelphia Common Pleas Court case of Jungersen v. Kaysen, #4129 C.P. #2 Phila. Co., September 12, 1952, 95 U.S.P.Q. 162, is to the contrary. While some weight may be given to the decision of that court, it is not controlling in a diversity case.[5] We are informed, however, that the Jungersen case is on appeal to the Pennsylvania Superior Court. (See 95 A.2d 347.) Although that court's opinion would be controlling here if not in conflict with the decisions of the Pennsylvania Supreme Court, we would hesitate to apply it to this case until the latter court had passed on the Superior Court decision, or time for appeal had expired. Because the present state of the law is in doubt on

this question and because the view we take of the asserted patent misuse is dispositive of this appeal, we will confine our discussion to that point only.

Before considering the facts more closely it would be appropriate to examine the applicable law.

In Carbice Corporation v. American Patents Development Corporation, 1931, 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819, it was held that a patentee could have no relief against a contributory infringer where the former required licensees, as a condition of their license, to use plaintiff's unpatented materials with the patented product.

The rule of the Carbice case was extended in Leitch Manufacturing Co. v. Barber Company, 1938, 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371, to a process patent. In that case plaintiff, the Barber Company, owned a patent on the process of coating concrete with an emulsion to prevent evaporation during curing. It granted no licenses for the use of the patent, but an implied license was given when the unpatented emulsion was purchased from the patentee. A bill was brought against a competing manufacturer of emulsion to enjoin contributory infringement, it being shown that defendant sold the emulsion knowing it was to be used in connection with the patent. The district court dismissed the bill on a finding that the patent was invalid; on appeal we reversed that finding. The Supreme Court did not pass on this question, but reversed because under the rule of the Carbice case no relief can be granted against a contributory infringer if the patentee has unlawfully extended his patent monopoly to obtain a limited monopoly of unpatented material.

In Barber Asphalt Corporation v. La Fera Grecco Contracting Co., 1940, 116 F.2d 211, this court had before it a direct infringement suit brought by a successor of the Barber Company against a contractor who had been using plaintiff's process

---

4. The decision of the district court is reported in 69 F.Supp. 555.

5. King v. Order of United Commercial Travelers of America, 1948, 333 U.S.

153, 68 S.Ct. 488, 92 L.Ed. 608; Berkshire Land Co. v. Federal Security Co., 3 Cir., 1952, 199 F.2d 438.

patent. The Stulz-Sickles Company, which supplied La Fera with emulsion, intervened and filed a counterclaim based on an alleged violation of the antitrust laws against Thompson Materials Corporation, plaintiff's exclusive licensee. We overruled our decision in the earlier Barber litigation and held the patent invalid for lack of invention. However, in order to dispose of the counterclaim it became necessary to determine whether Barber's licensing plan, adopted after the Supreme Court decision in the Leitch case, was lawful. It was found that contractors who desired to use the patent could obtain a license in two ways, either by purchasing emulsion manufactured by Barber, in which case a two cents per gallon royalty charge was included in the selling price of the emulsion, or by purchasing it from outsiders and paying a royalty to Barber's licensee at the rate of one cent per yard of concrete coated. Under the latter method the contractor would have to pay greater royalties if he economized by spreading the emulsion thin. By purchasing the Barber emulsion his royalty payments would remain constant regardless of the thickness of the coating. We held the licensing plan invalid as offering contractors no real choice, since they would be forced to purchase the Barber emulsion in order to protect themselves competitively. The rule of the Carbice and Leitch cases was applied and the cause remanded with instructions to reinstate the counterclaim.[6]

The Urquharts themselves did not produce any apparatus under their mechanical foam patents, but entered into agreements with manufacturers under which the latter were to exploit the inventions, paying the Urquharts the royalties exacted from purchasers. Besides the instant agreement with National Foam two similar contracts were made in 1943 with Fire Appliance Company and Walter Kidde & Company. Notices affixed to containers of stabilizer and foam producers informed purchasers that a license to use the two patents could be obtained only by purchasing stabilizer upon which royalties had been paid, i.e., stabilizer bought from the licensed manufacturer. As will subsequently be shown, it was not until 1947 that any steps were taken to license these patents other than through these three manufacturers.

In 1939, two years before the date of the contract here in dispute, George Gordon Urquhart was acting as consultant to American Fomon Company which, as owner of some Urquhart chemical foam patents, had sold its business to National Foam in 1935. He was informed by counsel that in view of the United States Supreme Court decision in the Leitch case it would be advisable to print a patent notice on National Foam's invoices to the effect that "Consumer licenses to use the processes of the above patents upon payment of fair royalties with apparatus and chemicals, *however obtained*, are available upon application to us." (Emphasis supplied.) A notice in substantially the above form was thereafter printed on the invoices. These invoices were apparently used by National Foam after it began producing and selling apparatus under the mechanical foam patents.

On June 3, 1941, a few months after the present contract was executed, George Gordon Urquhart was again advised of "the necessity of maintaining consumer license rates at least as low as the rates obtainable by purchasing the materials from licensed manufacturers." This opinion of counsel set forth at great length the decision of the First Circuit in B. B. Chemical Co. v. Ellis, 1 Cir., 1941, 117 F.2d 829. The latter discussed this court's decision in the La Fera case, as well as Dehydrators, Limited v. Petrolite Corporation, Limited, 9 Cir., 1941, 117 F.2d 183, and made it perfectly clear that an extension of the patent monopoly to unpatented materials by the means employed in La Fera constituted a patent misuse. Despite the admonitions of counsel the parties took no steps to effect a direct consumer licensing system. George Gordon Urquhart testified in May, 1946, on deposi-

---

6. See also B. B. Chemical Co. v. Ellis, 1 Cir., 1941, 117 F.2d 829, affirmed 314 U.S. 495, 62 S.Ct. 406, 86 L.Ed. 367; Dehydrators, Limited v. Petrolite Corporation, Limited, 9 Cir., 1941, 117 F.2d 183, and Philad Co. v. Lechler Laboratories, Inc., 2 Cir., 1939, 107 F.2d 747.

tion in the Pyrene case, which testimony constitutes part of the record on this appeal, that a consumer license form was never prepared, that such licenses were never offered consumers and that the Urquharts had no intention of offering consumers a license on payment of the same license fee as that specified in their agreement with National Foam. It was these admissions which led the district court in the Pyrene case to hold the patents invalid for misuse under the authority of La Fera.[7]

Late in 1947, after the Pyrene decision, the Urquharts printed a licensing form known as a "consumer's license" and placed it in their files. Under this plan a direct license to use the Urquhart patents was to be granted consumers who purchased stabilizer from sources other than a manufacturer-licensee. The royalty to be paid was 10¢ per pound, or 94¢ per gallon, of stabilizer. As the court below found, such direct consumers would pay a royalty in excess of that paid by customers of the manufacturer-licensee (the latter paying 15% of the price of the stabilizer) unless the price of stabilizer was raised to $6.50 per gallon. In 1947, at the time this plan was adopted, the price of stabilizer, according to the catalog of American-La France-Foamite Corporation, a leading competitor of National Foam, was $4.50 per gallon in small quantities, and as low as $3.80 in larger amounts, substantially the identical prices charged by National Foam.[8] It is conceded that no such consumer licenses were ever issued by appellant, and there is no evidence that they were ever applied for.

██ Appellant does not contend that National Foam is estopped to assert the invalidity of the licensing plan—his only defense is justification. It is argued that the higher royalty rate to be paid under consumer licenses was justified because the

Urquharts would have supplied services to direct licensees in the form of technical "know-how", sales engineering and advice. This is not borne out by the evidence. If such services were to have been included in the license it would have been a simple task to mention this in that form. An examination of the license fails to disclose any such purpose. Indeed, the wording of the form negatives any intent on the part of the Urquharts to do anything but license the patent.[9]

It is also urged that manufacturer-licensees, such as National Foam, incurred promotional expenses in connection with the sales of equipment and stabilizer which appellant, as direct licensor, would not have to bear, and that such added costs were reflected in the former's selling price, whereas direct consumers could purchase stabilizer from other sources for as low as $2.00 per gallon and would thus save money by obtaining a consumer's license from the Urquharts. This contention is also without factual support. Appellee points out that the $2.00 figure represents the cost of saponin, which is not considered an adequate substitute for stabilizer. If it were, it asks, why was it never used by consumers? From a review of the evidence we are inclined to agree that the type of stabilizer which would ordinarily be used in connection with appellant's patents was uniformly priced throughout the industry and that the American-La France-Foamite figures are typical.

██ While it is proper to grant licenses and determine royalties through sales of unpatented materials used in connection with the patent, such method is interdicted as a patent misuse in instances where a license can be obtained only by purchasing the unpatented materials from

---

7. The district court also held the patents invalid for lack of invention. This court, in 175 F.2d 408, found it necessary to affirm only on the second ground. Misuse was not discussed.

8. The trial judge found that there was no evidence that the price of stabilizer is or has been more than $4.50 a gallon.

9. Section 8 of the consumer's license reads as follows:
"(8) The Urquharts do not guarantee the working or performance of any processes hereby licensed or the working or performance of any Foam Producers, their sole relationship to the business being that of licensor of the patent rights."

664

the person granting the license,[10] or, where given a choice of purchasing from that source or another, the royalty to be paid in the latter situation is so much higher that the would-be-licensee is given Hobson's choice. As Judge Biggs indicated in La Fera, such alternative method of procuring licenses has the effect of driving the consumer into the arms of the manufacturer-licensee.

We are of the opinion that appellant's licensing plan is within the proscription of the La Fera case and therefore hold the contract, which is used as the vehicle whereby defendants have unlawfully enlarged their patent monopoly, invalid.[11]

The judgment will be affirmed.

10. Carbice Corporation v. American Patents Development, Corp., supra; Leitch Mfg. Co. v. Barber Co., supra.

11. The Court of Claims in Urquhart v. United States, 109 F.Supp. 409, a patent infringement suit involving the same patents which are the subject matter of this contract, dismissed the petition on the ground of patent misuse. The court considered the instant licensing agreement as well as the consumer licenses in concluding that the petitioner had illegally extended his patent monopoly.