**TURBO MACHINE COMPANY and Alba-Waldensian, Inc., Plaintiffs,**

v.

**PROCTOR & SCHWARTZ, INC., and Proctor Hydro-Set Company, Defendants.**

**Civ. A. No. 31156.**

United States District Court
E. D. Pennsylvania.
March 29, 1965.

Henry N. Paul, Jr., Robert B. Frailey, Paul & Paul, Philadelphia, Pa., for plaintiffs.

Charles Howson, Jr., Howson & Howson, Leon Edelson, Philadelphia, Pa., for defendants.

KIRKPATRICK, District Judge.

In this action for a declaratory judgment the plaintiff, Turbo,[1] asks the court to adjudge all seven claims of the defendant Proctor's U. S. Patent No. 3,022,926, issued February 27, 1962, to Bailey, invalid and not infringed. Proctor has counterclaimed for infringement. At the trial Proctor admitted that claims 4 to 7, inclusive, of the Bailey patent are not infringed.

Although the defendants have made a general charge of infringement against the plaintiffs, they now contend that their admission of noninfringement of claims 4 to 7 precludes the plaintiffs from obtaining a judgment on those claims by reason of want of a justiciable controversy. It is, however, well settled that the court may, in a case of this kind, in its discretion allow the validity of all the claims to be determined if it finds it appropriate to adjudicate the controversy in its entirety. I think that it is appropriate and will consider the validity of all claims. Sterling Aluminum Products, Inc., v. Bohn Aluminum & Brass Corp., 6 Cir., 298 F.2d 538, 540; Kalo Inoculant Co. v. Funk Bros. Seed Co., 7 Cir., 161 F.2d 981, 991.

The patent is, in terms of its principal use, for a method of treating and dyeing women's nylon stockings in order to ready them for sale after they come from the knitting machines. Claim 1 of the patent is representative, the remaining claims merely adding steps

1. The co-plaintiff, Alba-Waldensian, Inc., is a customer of Turbo. The co-defendant, Proctor Hydro-Set Company, is a subsidiary of Proctor and an exclusive licensee under the patent in suit.

which do not affect the basic invention. It is as follows:

"1. In the method of setting and dyeing textile articles made of synthetic thermoplastic yarns capable of being heat-set to predetermined shape and dyed at temperatures within the range of 212° F. to 330° F., the steps which comprise (1) mounting said articles on boards conforming to said predetermined shape, (2) introducing said boarded articles into a treatment zone closed to room atmosphere and containing steam under superatmospheric pressure at a temperature between 212° F. to 330° F., (3) maintaining the boarded articles in said treatment zone at least until said articles are heat-set to said predetermined shape, (4) dyeing said boarded articles while in said treatment zone with a hot liquid dyeing medium capable of dyeing the synthetic thermoplastic yarns until said boarded articles are dyed to the desired color and (5) maintaining substantially constant said steam conditions throughout said treatment zone during setting and dyeing of the boarded articles therein so that said boarded articles are continuously subjected to substantially uniform temperature while in said zone." (Numerals inserted.)

The patent drawings show a machine capable of carrying out the process. In general it consists of a large, cylindrical tank or autoclave at each end of which there is an airlock or vestibule. The stockings mounted on forms are admitted into the entrance vestibule and steam is introduced until pressure equal to that of the central portion is attained. The interior door is then opened and the truck is moved through the central portion where the stockings are dyed, scoured, and rinsed by means of sprays, in successive communicating compartments. Thence the truck moves out through the exit vestibule. As one truck is admitted into the central portion, another truck enters the entrance vestibule to achieve what the defendants' witness describes as a continuous batch process.

The invention derives from a characteristic of nylon fabrics, namely, the quality of assuming a permanent "set" under the influence of heat and retaining that set unless subjected to a higher temperature. Thus, a nylon stocking may be made to retain the shape of the human leg by steaming it while mounted upon a suitably shaped board. The fabric tends to shrink during the setting treatment and at the same time the molecular structure of the yarn is rearranged so as to make the fabric dimensionally stable. In order to be commercially acceptable, nylon hosiery must be heat-set in order to give it a permanent shape and to enable the consumer to launder it without excessive wrinkling.

Prior to the invention in suit the conventional method (still widely used) of treating nylon hosiery to obtain these results consisted of initially "pre-boarding" the stockings, that is, mounting them on forms where they were set by being subjected to high pressure steam and elevated temperatures, after which they were stripped from the boards, made up in bundles, placed in bags and dyed in vats. They were then dried by heated air either on forms again or laid out on tray driers. There was also a "post-boarding" process which consisted in first dyeing the hosiery and then mounting it on forms and subjecting it to steam at high pressures and temperatures.

As ordinarily practiced by the conventional method, the operation involved 14 to 17 separate handlings of the hose, and to put 100 dozen pairs of stockings in marketable condition took some nine hours. As opposed to this, the Bailey operation requires about one and one-half hours and effects a saving in material and labor costs of sixteen cents per dozen pairs. It was to the objective of accomplishing such reduction of time

and expense that the Bailey invention was directed.

■ Prior art cited by the plaintiffs shows that no one of the operations of Bailey's process, taken by itself, was novel and that a number of the prior patents combined several of its steps, although none of them covered the whole process. Of course, even though a method patent combines for the first time a number of old steps, the question of obviousness is still to be met. Upon that point it seems to me highly significant that, although nylon hosiery came on the market as early as 1939, there appeared, so far as the record shows, no attempt to break away from the old methods until Bailey's time. A brochure issued by the Du Pont Company introducing nylon to manufacturers and others, speaking of the characteristic of nylon to take a permanent set, says, "Thus hosiery, after being fully knitted, *but before dyeing*, is placed on a special form and 'pre-boarded' in this manner to an exact fit." (Emphasis supplied.) The art after the advent of nylon seems to be chiefly addressed to putting the nylon stockings into condition for the practice of the conventional dyeing process. In fact, their emphasis on the necessity of treating nylon with higher temperatures either before or after the hot dye bath in order to avoid setting permanent wrinkles into the fabric during the dyeing process leads directly away from Bailey's concept that dyeing and setting could be finally accomplished at the same temperatures and pressures.

The Bailey invention is based upon the principle (or discovery) that it was unnecessary to dye nylon hosiery at one temperature and set it at a different and higher one. The specification discloses and the patent claims a process by which hosiery can be set (to its final shape) and dyed at one and the same temperature, a temperature which remains constant and uniform throughout the setting and dyeing cycle. The result is that hosiery can be put in commercially acceptable form in a very short time and in a comparatively simple machine.

The claims do not say that the setting and dyeing must be concurrent, but certainly the specification demonstrates that that would be "the best mode contemplated by the inventor of carrying out his invention" and, as a matter of fact, there would be no sense in trying to practice the invention in any other way.

■ There are several matters which should be mentioned before the discussion is carried further. (1) Although it is evident from the file wrapper history that Bailey had in mind a continuous operation and although his patent drawings show a machine suitable for that kind of process, none of the claims call for uninterrupted movement of the stockings through the treatment chamber. However, the validity of a patent is in nowise impaired merely because the applicant sees fit in the course of proscuting his application not to claim some feature of the invention as originally conceived. The method of this patent, even as limited by the claims, is still capable of continuous operation. (2) The claims do not say that the heat-setting and dyeing are concurrent. In fact, the specification states that, "the setting may be completed at any desired stage * * *" even "during the period that the articles are temporarily confined within the entrance vestibule * * *." (3) The fact that the specification states that the method is intended to cover "the treatment of textile materials of all kinds and character," and thus describes an invention much broader than is claimed and one which would probably be unpatentable in view of the prior art has no effect on the validity of the claims. Although the specification on occasion may be resorted to to aid in the interpretation of a claim, a claim the terms of which are clearly and precisely stated and easily understood cannot, under the guise of interpretation, be expanded by the specification either to cover an alleged infringing article or to make the claim so broad that the prior art will invalidate it. In the present case the claims, when read in the light of

the specification, are free from ambiguity.

Turning now to the prior art, the general statement may be made that in none of the patents is it contemplated that nylon or other thermoplastic yarn should receive its final set at the same temperature at which it was dyed and consequently none discloses other than coincidental concurrent heat-setting and dyeing.

It is true that long before the Bailey invention both Ziock and Schuster disclosed automatic machines for rinsing, scouring, and dyeing stockings on forms by means of sprays. In neither of these patents (both of which were prior to nylon) is there any teaching or suggestion of the desirability or even the possibility that the process was adaptable to dyeing nylon stockings on boards. They show no setting, no steam, and no pressure.

Kroznowski and Walter both use liquid baths to treat flat fabric. Walter's treatment and that of Kroznowski (British) include passing the fabric through a liquid dye bath. The Walter patent is perhaps the closest to Bailey. Cloth is fed through sealing rollers into and through a chamber containing a dye bath and steam under elevated temperature and pressure. The patent points out that it is suitable for the treatment of any nitrogenous fabric including nylon, but the patentee of the Walter invention apparently had not the slightest idea of including the heat-setting of nylon articles to predetermined shapes. Admittedly, some setting would occur to a nylon fabric passing through this device just as some setting would occur when nylon stockings were immersed in a hot dye bath in a bag, but the trade certainly does not want the kind of set that the stockings would get when bundled up in that fashion. Nor, apparently, was it willing to accept the kind of set which fabrics would receive by the Walter process, without further treatment, because, in practice, flat open-width fabrics were always, either before or after the dye bath, subjected to much

higher temperatures in order to give them a satisfactory set and make them commercially acceptable.

A number of the prior art patents (Wardle & Davenport, Schwartz, Hurxthal) simply disclose equipment which does no more than pre-board stockings intended to be used in accordance with the conventional method of dyeing. Of course, the patents which issued prior to the appearance of nylon did not even suggest a solution of the problem to which the Bailey patent was addressed, namely, the dyeing of nylon stockings under the conditions of temperature and steam pressure required for setting.

The advance over the prior art made by the Bailey patent was recognized in an opinion of the United States District Court, Judge McGuire, holding the patent valid and reversing a decision of the Patent Office which had rejected all the claims after many years of Patent Office proceedings. The Court said, "There is no question in the Court's mind but that the process claimed evidences an improvement in the art, and the mere fact, if it is a fact, that the alleged advantage of rapid processing and automation would be lost if the boarded articles are to be stopped at any particular step in the processing or are only intermittently moved at slow speeds, does not in any way derogate from the basic contribution made—there can be continuous movement."

It is true that none of the prior art patents discussed above were cited by counsel to Judge McGuire, but the differences between the art before him and the art before me do not lead me to a different conclusion. Judge McGuire clearly recognized that it was the uniformity of the temperatures and pressures throughout the process which made continuous operation feasible.

I agree with Judge McGuire that the method of the Bailey patent constitutes an advance over the prior art and, upon the record before me, I conclude that it is an improvement which would not have been obvious at the time the invention was made to a person hav-

ing ordinary skill in the art. I, therefore, hold all seven claims of the patent valid.

The defendants charge that the operation of a machine manufactured by Turbo, known as the Turbo Dye Boarder, infringes the Bailey patent. The Turbo Dye Boarder is a machine for setting and dyeing stockings which has a rectangular chamber into which the stockings, mounted on forms, are introduced at atmospheric pressure. The door is closed and sealed and steam injected into the chamber to bring it up to a predetermined temperature. When the desired temperature is reached, a dye solution is sprayed on the stocking forms. After sufficient time for dyeing has elapsed, a vent in the bottom of the chamber is opened and rinse water sprayed over the stockings. This, of course, lowers the temperature and pressure rather sharply. After rinsing, the vent is closed and steam admitted so that the chamber is again heated, this time to a temperature which is always at least 20° hotter than that in the chamber during the dyeing cycle.

A number of things are to be observed about this operation: first, some setting admittedly occurs during the dyeing cycle and during this cycle the stockings are subjected to a substantially uniform and constant temperature; second, if the entire treatment cycle is considered, the stockings from the time they enter the treatment chamber until they are withdrawn from the machine are subjected to widely varying temperatures and pressures; and, third, some additional setting occurs during the final steaming at elevated temperature. Though all witnesses were in agreement on this last point, the defendants contend that it is simply a flourish or frill contrived in order to evade infringement. There is no evidence whatever to support this suggestion.

The question of infringement comes down to whether or not commercially acceptable hose are produced at the completion of the Turbo dyeing cycle. If they are, the Turbo process infringes, even though an additional setting treatment might improve the quality of the product. On this point, the proof consists principally of evidence of tests conducted by each party, supplemented by expert testimony.

The plaintiffs' tests were designed to show that the final steaming step of the Turbo process was necessary in order to produce satisfactory stockings, and there was expert testimony to that effect. The plaintiffs offered, among other things, seven stockings, three of which had been finished in accordance with the Turbo process, utilizing the additional heat-setting step. Although to a hosiery buyer those stockings may show some superiority over the others (in the treatment of which the final step was omitted), I can only say that I cannot agree with the statement of the plaintiffs' brief that "Their superiority in shape is obvious." Certainly, it is not striking.

■ The defendants' tests were designed to show the opposite, but, bearing in mind that the burden of proof is upon the patent owner to prove infringement by the fair weight of the evidence, I am unable to accept them as sufficient to establish infringement. I do not consider it of great importance that they were not conducted in the Turbo Dye Boarder but in the Hydro-Set machine inasmuch as it is clear that the conditions of time and temperature in the two during the dyeing cycle of the tests were substantially the same. However, what is of importance is that the testimony relating to this test, which consisted of laundering the stockings in order to show that they had been sufficiently set, was limited to the bare fact that they were laundered in water of 125° temperature with a detergent, and the only evidence as to how long they were in the water (a vitally important factor) is the statement that they were laundered "the way women generally wash their hose." No evidence was produced to show how long it usually takes a woman to wash a pair of stockings—

a matter of which I can hardly take judicial notice.

I do not think that the evidence of either the plaintiffs' or the defendants' tests was completely convincing (though the plaintiffs' were more complete), but, on the whole, I have come to the conclusion that the evidence produced does not establish that the hosiery processed in the Turbo machine is permanently and satisfactorily set at the end of the dyeing cycle. This being so, it follows that there is no infringement.

In summary, the process of the Turbo machine includes the first step of the Bailey process, namely, mounting the articles on boards, etc. It includes an equivalent of the second step, which is introducing the articles into a treatment zone closed to room atmosphere and containing steam under high pressure and at a high temperature. I do not think that it really makes any difference whether the stockings are subjected to the elevated temperature and pressure of the treatment chamber at the moment they enter the zone or whether they are subjected to them in the treatment chamber after a build-up in heat and temperature which begins at room atmosphere. The third and fourth steps (setting and dyeing) are to be found in the Turbo process. The Turbo process does *not* include the fifth step. It does not maintain substantially constant steam conditions and uniform temperature continuously during the setting and dyeing of the boarded articles. It is just this fifth step which in this case distinguishes the patented process from the prior art. "But when, as here, the accused process does not embrace those steps which distinguish the patented one from the prior art it does not infringe." Wabash Corp. v. Ross Electric Corp., 2 Cir., 187 F.2d 577, 584.

There are several controverted issues which I do not think require extended discussion but upon which I will enter definite rulings with the thought that they may be useful in the event of an appeal.

(1) The "constant" steam conditions and "uniform" temperature appearing in the claims describe steam conditions and temperature which must remain the same at all times from the beginning to the end of the setting, scouring, and dyeing of the stockings in the treatment chamber, and not merely conditions of steam and temperature the same in all parts of the chamber at any given instant, and I hold that time uniformity rather than space uniformity is what the words mean.

(2) There was a dispute as to whether the terms "treatment zone" and "treatment chamber" appearing in the claims include the vestibules at either end of the large cylindrical tank in which the hosiery is subjected to scouring and dyeing. My conclusion is that they do not.

(3) Another matter which was in dispute and upon which a great deal of testimony was taken is the meaning of "steam" with reference to the patented process. I adopt the defendants' position upon this point, namely, that the term as used in the patent is not to be construed as meaning only "saturated steam", that so far as the method of the patent is concerned, any form of steam may be present, and that steam is intermittently introduced into the treatment chamber of the Turbo Dye Boarder all through the dyeing cycle.

(4) I have not discussed the question of file wrapper estoppel. The plaintiffs made very little of it, and I find no ground for its application.

One more matter: The plaintiffs in an amended reply to the defendants' counterclaim raised the defense that the defendants' patent is unenforceable because of misuse because of a mandatory package licensing policy. I find as a fact that the defendants' policy of licensing did not involve coercion or compulsory requirements that purchasers of their Hydro-Set machine accept a license under all or other Bailey and Brewin patents, and I find that purchasers were not compelled to take licenses which required them to pay royal-

ties under patents which they did not use or licenses extending payment of royalties to the expiration date of a patent granted subsequently. Moreover, Proctor has modified or changed all of its licenses so that licenses are now granted under the Bailey patent alone. Under these circumstances, it seems to me that even if, contrary to the fact, there had been compulsion, Proctor would have abandoned the forbidden practice and dissipated the consequences of its conduct.[2] See B. B. Chemical Co. v. Ellis, 314 U.S. 495, 498, 62 S.Ct. 406, 86 L.Ed. 367. The present case is clearly distinguishable from American Securit Co. v. Shatterproof Glass Corp., 3 Cir., 268 F.2d 769.

An order for judgment in accordance with the foregoing opinion may be presented.

---

2. The record does not disclose the fact that the license to Picolet Dye Works, Inc., has been modified, but Proctor's attorney asserts that it has and I see no reason to doubt his assertion and, if he desires, would open the record to let him prove the facts.