**VALMONT INDUSTRIES, INC., et al,**
Plaintiffs,

v.

**YUMA MANUFACTURING COMPANY,**
Inc., Defendant.

**VALMONT INDUSTRIES, INC., et al.,**
Plaintiffs,

v.

**ENRESCO, INC., Defendant.**

Civ. A. Nos. 67-C-136, 67-C-331.

United States District Court
D. Colorado.

March 6, 1969.

Dawson, Nagel, Sherman & Howard, by Michael A. Williams, Denver, Colo., McGrath, North, Nelson & Shkolnick, by John E. North, Omaha, Neb., and Henderson & Strom, by H. Robert Henderson, Omaha, Neb., for plaintiffs.

Naylor & Neal, by James M. Naylor, San Francisco, Cal., Spurgeon, Aman & Hanes, by Richard W. Hanes, Colorado Springs, Colo., and Benedetti & Fennie, by Kent J. Fennie, Yuma, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

WILLIAM E. DOYLE, District Judge.

This is a patent infringement action, wherein the plaintiffs seek a declaratory judgment that U. S. Patent No. 2,604,359 is valid and infringed by the defendants, an injunction against further infringement and an accounting.[1] In the original complaint and subsequent amendments, the plaintiffs have charged both defendants with infringement of claims 8, 9, 10 and 13 of U. S. Patent No. 2,604,359; defendant Enresco with actively inducing infringement of U. S. Patent No. 2,604,-359 by licensing to Yuma the right to manufacture and sell the Enresco irrigation system which infringes claims 8, 9, 10 and 13 of that patent; and defendant Enresco with unfair competition relative to the unauthorized use of a photograph used extensively by plaintiffs and which has acquired secondary meaning. The defendants deny that the irrigation system which they make and sell infringe claims 8, 9, 10 and 13 of U. S. Patent No. 2,604,359, and they have affirmatively asserted defenses of patent invalidity, non-infringement, file wrapper estoppel, and patent misuse by the plaintiffs Zybach and Trowbridge.

---

1. Both Civil Action No. 67–C–136 and Civil Action No. 67–C–331 allege infringement of U.S. Patent No. 2,604,359, and by Pre-Trial Order they were consolidated for trial.

This cause was tried to the Court, and the Court entered judgment that claims 8, 9, 10 and 13 of United States Patent No. 2,604,359 are valid and infringed by the defendants' self-propelled sprinkling irrigation system, that the doctrine of file wrapper estoppel is inapplicable to claims 8, 9, 10 and 13 which claims are entitled to a broad range of construction and equivalents, and that the defendant Enresco, Inc., has induced defendant Yuma Manufacturing Company, Inc., to infringe United States Patent No. 2,604,-359. At the close of the trial it was determined that there was a technical patent misuse by reason of a stipulation in the license agreement providing for the payment of royalties on parts and portions. However, there was a reservation of this issue, and inasmuch as there was a renunciation of the stipulation as of July 1, 1968, it becomes necessary to finally determine this question of patent misuse so as to decide whether damages predate the purge date.

We are here concerned with a self-propelled sprinkling irrigation apparatus for irrigating large sections of land. Such an apparatus or system may be used where the natural rainfall is not sufficient to cause a maximum growth of crops, or when the operator wishes to avoid the labor and time involved in either running water along ditches or shifting stationary pipes provided with sprinkler heads from one position to another until the desired area is covered, or where the land is not sufficiently level for ditch irrigation. It has been found that this apparatus has great practical value and that United States Patent No. 2,604,359 constitutes a pioneer contribution to the art. Both the system described in U. S. Patent No. 2,604,359 and the system of the defendants are designed to extend up to approximately one-quarter mile in length to maintain an elongated water distributing pipe substantially straight as it rotates about its inner end, and to operate unattended for several days or weeks.

On July 22, 1952, U. S. Patent No. 2,604,359 was duly and legally issued to plaintiff Zybach for an invention entitled "Self-Propelled Sprinkling Irrigating Apparatus." By an agreement executed in August 1952, plaintiff Trowbridge purchased a 49 percent interest in the Zybach invention of 2,604,359, which arrangement has not changed to date. Plaintiffs Zybach and Trowbridge are the joint owners of the entire right, title and interest in Patent No. 2,604,359.

On July 28, 1954, plaintiffs Zybach and Trowbridge granted an exclusive license to plaintiff Valmont, then Valley Manufacturing Company, to manufacture, use and sell the apparatus covered by Patent No. 2,604,359. Paragraph four of the license agreement provided that Valmont pay Zybach and Trowbridge "a royalty of 5 per cent on the gross price received from the sale of all self-propelled sprinkling irrigations systems, parts or portions thereof * * *."

The contention of patent misuse is that the described royalty provision is a patent misuse *per se* because it requires Valmont to pay royalties on unpatented parts and portions of the patented irrigation system. Valmont has, in fact, paid Zybach and Trowbridge a 5 percent royalty on all parts and portions of the patented irrigation system sold by it as spare and replacement parts. However, the amount of royalty paid on the parts and portions is quite small compared to the royalties paid on the patented system as a unit.[2]

On July 1, 1968, during the pendency of this suit, plaintiffs voluntarily amended the license agreement of July 28, 1954, by specifically providing that the words "self-propelled irrigations system, parts or portions thereof" which appear in that agreement are amended to read "self-propelled irrigations systems and portions thereof coming within the scope of

---

2. For example, in 1967 the royalties paid on parts and portions of the patented irrigation system amounted to $3,686.86, while royalties of $465,204.48 were paid on the patented system as a unit.

one or more of U. S. Letters Patent 2,-604,359, 2,941,757 and 3,001,721." Since July 1, 1968, Valmont has not paid Zybach and Trowbridge any royalties on parts or portions of the patented irrigation system. We have heretofore held that any patent misuse which occurred prior to July 1, 1968, if any did in fact exist, has been effectively dissipated and purged by the July 1, 1968, amendment and the conduct of the plaintiffs thereafter. Therefore, the issue of patent misuse is limited to the period prior to July 1, 1968, when the clause requiring payment of royalties on parts and portions of the patented system was fully effective.

A patent is a grant of the right to exclude others from making, using or selling one's invention, and includes the right to license others to make, use or sell it. It is a legitimate monopoly having as its primary purpose the advancement of the arts and sciences rather than reward to the individual. It is not a certificate of merit, but an incentive to disclosure. Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644 (1945).

The history of the administration of patents has been one of reconciling the inventor's private rewards with the public interest in promoting progress. Kendall v. Winsor, 21 How. 322, 327–329, 16 L.Ed. 165 (1859). To protect the interest of the public, the courts have resisted attempts to enlarge the monopoly granted by the patent by the formulation of the judicial doctrine of patent misuse.

It has been held in a long line of patent cases that a patentee who utilizes his patent monopoly to secure a limited monopoly on unpatented articles or material will be denied all relief against infringement of his patent.[3] The basic rationale for the patent misuse doctrine is the policy of protecting the public's interest in free competition by refusing to enforce contracts which suppress free competition or restrain trade.[4]

3. International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947) ; Mercoid Corp. v. Mid-Continent Investment Co., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376 (1944) ; Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942) ; B. B. Chemical Co. v. Ellis, 314 U.S. 495, 62 S.Ct. 406, 86 L.Ed. 367 (1942) ; Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852 (1940) ; Leitch Manufacturing Co. v. Barber Co., 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371 (1938) ; Carbice Corp. of America v. American Patents Development Corp., 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819 (1931) ; Motion Picture Patents Co. v. Universal Film Manufacturing Co., 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871 (1917) ; American Securit Co. v. Shatterproof Glass Corp., 268 F.2d 769 (3d Cir. 1959) ; Cole v. Hughes Tool Co., 215 F.2d 924 (10th Cir. 1954) ; Williams v. Hughes Tool Co., 186 F.2d 278 (10th Cir. 1950) ; Columbus Automotive Corp. v. Oldberg Manufacturing Co., 264 F.Supp. 779 (D.Colo.1967), aff'd per curiam, 387 F.2d 643 (10th Cir. 1968).

4. Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942) ; Columbus Automotive Corp. v. Oldberg Manufacturing Co., 264 F.Supp. 779 (D.Colo.1967), aff'd per curiam, 387 F.2d 643 (10th Cir. 1968). In *Morton Salt,* the Supreme Court made clear that the essence of the patent misuse doctrine is protection against monopoly or at least unfair competition in the sale of unpatented products:

"It is a principle of general application that courts, and especially courts of equity, may appropriately withhold their aid where the plaintiff is using the right asserted contrary to the public interest. * * * Where the patent is used as a means of restraining competition with the patentee's sale of an unpatented product, the successful prosecution of an infringement suit even against one who is not a competitor in such sale is a powerful aid to the maintenance of the attempted monopoly of the unpatented article, and is thus a contributing factor in thwarting the public policy underlying the grant of the patent. Maintenance and enlargement of the attempted monopoly of the unpatented article are dependent to some extent upon persuading the public of the validity of the patent, which the infringement suit is intended to establish. Equity may rightly withhold its assistance from such a use of the pat-

Therefore, it is irrelevant whether the party invoking the patent misuse doctrine has suffered from the patentee's misuse of his patent for it is the adverse effect upon the public interest which is the primary concern. Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 494, 62 S.Ct. 402, 86 L.Ed. 363 (1942).

■■■ The patentee enjoys a monopoly as to his invention, but under the patent misuse doctrine he may not use his patent or patents to control the manufacture, use or sale of unpatented articles or materials.[5] To establish the defense of patent misuse, it is not necessary to show a violation of the Clayton Act or the existence of an actual monopoly. Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942); Berlenbach v. Anderson & Thompson Ski Co., 329 F.2d 782 (9th Cir. 1964). It is sufficient to show the existence of restrictive agreements which tend to suppress competition in non-patented articles or materials.

Defendants' contention of patent misuse is directed solely to the requirement in the royalty clause of the license agreement that the licensee, Valmont, pay a 5 percent royalty to Zybach and Trowbridge on unpatented parts or portions of the patented sprinkler irrigation system which are sold by Valmont separately as spare or replacement parts for the patented system.

■■■ There are three types of licensing arrangements which the courts have treated as patent misuse: (1) tying arrangements—schemes requiring the purchase of unpatented goods for use with the patented apparatus;[6] (2) license agreements requiring the licensee not to deal in competitive articles;[7] and (3) coercive package licensing—conditioning the granting of a license under one patent upon the acceptance of another and different license.[8] Economic coercion and restraint on free competition in unpatented articles are necessary corollaries to each of these arrangements, and thus the

---

ent by declining to entertain a suit for infringement, and should do so at least until it is made to appear that the improper practice has been abandoned and that the consequences of the misuse of the patent have been dissipated." 314 U.S. at 492–493, 62 S. Ct. at 405.

5. See cases cited note 3, *supra*.

6. International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947); Mercoid Corp. v. Minneapolis-Honeywell Regulator Co., 320 U.S. 680, 64 S.Ct. 278, 88 L.Ed. 396 (1944); Mercoid Corp. v. Mid-Continent Investment Co., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376 (1944); B. B. Chemical Co. v. Ellis, 314 U.S. 495, 62 S.Ct. 406, 86 L.Ed. 367 (1942); Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942); Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852 (1940); Leitch Manufacturing Co. v. Barber Co., 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371 (1938); International Business Machines Corp. v. United States, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085 (1936); Carbice Corp. of America v. American Patents Development Corp., 283 U.S. 27, 51 S.Ct. 334, 75 L.Ed. 819 (1931);

United Shoe Machinery Corp. v. United States, 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708 (1922); Motion Picture Patents Co. v. Universal Film Manufacturing Co., 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871 (1917).

7. United Shoe Machinery Corp. v. United States, 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708 (1922); Berlenbach v. Anderson & Thompson Ski Co., 329 F.2d 782 (9th Cir. 1964); National Lockwasher Co. v. George K. Garrett Co., 137 F.2d 255 (3d Cir. 1943); Radio Corp. of America v. Lord, 28 F.2d 257 (3d Cir. 1928); Waco-Porter Corp. v. Tubular Structures Corp. of America, 222 F.Supp. 332 (D.Calif.1963).

8. United States v. Paramount Pictures, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948) (Copyright "block-booking."); American Securit Co. v. Shatterproof Glass Corp., 268 F.2d 769, 777 (3d Cir. 1959). In McCullough Tool Co. v. Well Surveys, Inc., 343 F.2d 381, 408 (10th Cir. 1965) and Turbo Machine Co. v. Proctor & Schwartz, Inc., 241 F.Supp. 723, 729–730 (D.Pa.1965), coercive package licensing was recognized as a patent misuse, but the necessary element of coercion was absent.

courts have had little difficulty in finding that the patentee has misused his patent when any one of these arrangements is present in a licensing agreement.[9]

It is obvious that this type of arrangement is not present in the instant situation. There is present here no requirement, either express or implied, for the purchase of any unpatented goods. Valmont is not required to purchase the unpatented parts or portions of the patented irrigation system from the licensors, Zybach and Trowbridge, in fact, they do not even manufacture or sell goods of any kind, nor are the purchasers or dealers of the patented irrigation system required to purchase the unpatented parts or portions from the patentee's licensee, Valmont. Furthermore, the license agreement did not require the licensee, Valmont, to refrain from manufacturing or selling any other type of irrigation equipment or any other products which would be in competition with the patented sprinkler irrigation system covered by the license, nor was Valmont required, as a condition of obtaining the license, to accept and pay for a license on another patent.

We further find that on the evidence presented the royalty provision in question did not extend the patent monopoly nor did it tend to suppress free competition in unpatented parts or portions of the patented irrigation system. There is no requirement, either express or implied, that dealers and purchasers of the patented irrigation system buy the unpatented parts or portions of the system from Valmont. Such parts can be purchased in the open market and many dealers and purchasers of the patented irrigation system do purchase repair and replacements parts from sources other than Valmont. Furthermore, Valmont's royalty payments on unpatented parts sold by it for use in the patented irrigation system did not create any price differential or discrimination. Parts which are used in both the patented irrigation system and other products manufactured or sold by Valmont were at all times sold by Valmont to the public at the same price, and if any royalty was paid on such parts the royalty merely reduced the profit on that particular item to Valmont and did not increase the price to the consumer. The only discernible effect of the royalty payments on parts and portions of the patented irrigation system is that Valmont's profit on the sale of such items was reduced.

There is no evidence that the plaintiffs, Zybach and Trowbridge, coerced Valmont into agreeing to pay royalties on parts or portions of the patented irrigation system. Rather, the evidence is that Valmont voluntarily agreed to pay a royalty on parts and portions because of its view that this was a convenient way of determining fair compensation for the patented product which it was to manufacture under the license agreement. The patent owners could have exacted a higher royalty to achieve the same effect. It is clear from the evidence that this license agreement was entered into voluntarily by both parties, without coercion, apparently because the parties thought it was a convenient and fair way to proceed.

The leading case on the patent misuse question involved in this case is Automatic Radio Mfg. v. Hazeltine Research, Inc., 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312 (1950). The patents involved in *Hazeltine* pertained to the manufacture of radio broadcasting apparatus. The license agreement at issue in *Hazeltine* granted Automatic Radio the right to use, in the manufacture of its "home" products, any or all of the patents held by Hazeltine Research. Automatic Radio was not, however, obligated to use Hazeltine's patents in the manufacture of its products. For this license, Automatic Radio agreed to pay Hazeltine royalties based upon a small percentage of the selling price of complete radio broadcasting receivers, and in any event a minimum of $10,000 per year. Hazeltine brought suit to recover the minimum

---

9. See cases cited in notes 6–8, *supra.*

royalty due for the year ending August 31, 1946, and Automatic Radio interposed the defense of patent misuse.

The Supreme Court reviewed the classical patent misuse cases[10] and concluded that it was obvious that they did not apply to the royalty provision in question. The Court stated:

"That which is condemned as against public policy by the [classical misuse] cases is the extension of the monopoly of the patent to create another monopoly or restraint of competition—a restraint not countenanced by the patent grant. See, e. g., Mercoid Corp. v. Mid-Continent Investment Co., 320 U.S. 661, 665–666 [64 S.Ct. 268, 271, 88 L.Ed. 376]; Morton Salt Co. v. [G. S.] Suppiger Co., 314 U.S. 488, 778 [62 S.Ct. 402, 86 L.Ed. 363]; Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 456 [60 S.Ct. 618, 84 L.Ed. 852]. The principle of those cases cannot be contorted to circumscribe the instant situation. This royalty provision does not create another monopoly; it creates no restraint of competition beyond the legitimate

grant of the patent." 339 U.S. at 832–833, 70 S.Ct. at 897.

The Court, in effect, held that the test for patent misuse is the purpose and effect of the royalty provision. If its purpose and effect is to enlarge the patent monopoly and to restrain free competition in unpatented items, then the patent has been misused. The Court mentioned "convenience" but that was clearly not the determinative factor in its decision that the patent had not been misused. Convenience was mentioned to meet the defendants' "incendiary, yet vague, charges that respondent uses its accumulation of patents 'for the exaction of tribute,' " and to show that the reason for the royalty provision was sound business judgment and not for the purpose of enlarging the patent monopoly. 339 U.S. at 834, 70 S.Ct. at 898.

A number of other courts have had occasion to pass on this question. These hold that the use of unpatented items in conjunction with the patented items to determine the royalty base does not in and of itself constitute a misuse of the patent.[11] On the other hand, the

---

10. These cases have condemned three types of licensing arrangements—"schemes requiring the purchase of unpatented goods for use with patented apparatus or processes, prohibiting production or sale of competing goods, and conditioning the granting of a license under one patent upon the acceptance of another and different license." 339 U.S. at 830–831, 70 S.Ct. at 896. See notes 6–8 and accompanying text, *supra*.

11. Ohio Citizens Trust Co. v. Air-Way Electric Appliance Corp., 56 F.Supp. 1010 (D.Ohio 1944), cited with approval in Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., 339 U.S. 827, 833 n. 7, 70 S.Ct. 894, 94 L.Ed. 1312 (1950). In *Ohio Citizens*, the court, on a motion for summary judgment, held that the patent had not been misused. The licensee's motion for summary judgment was based upon the language of the license agreement which provided that the licensee "shall have the right in its uncontrolled discretion to use parts patented by others or unpatented, * * * but the royalty must be paid to first parties [licensor] upon the Air-Way Sanitary

System as a whole, and royalty must be paid to first parties upon any articles sold separate for use upon the cleaner, which in any way relate or pertain to the art of cleaning." 56 F.Supp. at 1011.

The arguments and contentions advanced in *Ohio Citizens* were essentially the same as those which are presented here. After examining the classical misuse cases, e. g., *Mercoid, supra, Morton Salt, supra, Leitch Mfg. Co., supra,* and *Carbice Corp., supra,* and finding them inapplicable to the facts of the case before it, the court concluded that

"No case has been cited, and we have been able to find none, holding that the amount of royalty to be paid under a license agreement may not be measured by a rate or percentage calculated upon the sales of completed devices, parts and accessories, contemplated to be manufactured under the patents involved, irrespective of whether such sales include items which do not come within the claims of the licensed patents." 56 F.Supp. at 1012.

The Supreme Court in Graver Tank & Mfg. Co. v. Linde Air Products Co., 336

courts condemn as a patent misuse the utilization of unpatented items to determine the royalty base and at the same time to extend the patent monopoly or to create another monopoly or restraint of competition in unpatented items.[12]

We have examined McCullough Tool Co. v. Well Surveys, Inc., 343 F.2d 381, 404–410 (10th Cir. 1965); McCullough Tool Co. v. Well Surveys, Inc., 395 F.2d 230 (10th Cir. 1968); and Well Surveys, Inc. v. Perfo-Log, Inc., 396 F.2d 15 (10th Cir. 1968), which are leading cases on this subject from the Tenth Circuit. In each of these cases, the court held that Well Surveys, Inc. was not misusing its patents by its use of package license agreements. The basis of these decisions was that unpatented operations were used to determine the royalty base only, the license agreements were voluntary on the part of the licensees, there was no evidence of economic coercion and W. S. I. was not attempting to extend the patent monopoly beyond the scope of the Swift Patent. The Supreme Court's decision in *Hazeltine, supra,* was carefully considered and followed.

As we view the royalty provision in this case, it utilized unpatented parts or portions in conjunction with the patented system as a means of determining the royalty base only; it did not extend the patent monopoly, nor did it have any tendency to suppress free competition in unpatented parts or portions of the patented irrigation system.

Defendants argue that this case is governed by Mercoid Corp. v. Mid-Continent Investment Co., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376 (1944). The patent involved in *Mercoid* was a combination patent for a domestic heating system. The elements of the combination patent was a stoker, a thermostat and a combustion stoker switch, none of which were claimed in the patent. Mid-Continent owned the combination patent and by a license agreement it gave Minneapolis-Honeywell the exclusive right to make, use, sell and sub-license others to make, use and sell the combination patent. The royalty payments under the license, however, were based only upon sales of the combustion stoker switch which was itself unpatented. Mid-Con-

---

U.S. 271, 69 S.Ct. 535, 93 L.Ed. 672 (1949), aff'd on rehearing, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950), held that there was no patent misuse notwithstanding a requirement of purchase of non-patent materials where such purchases were not a condition of the license.

Cf. National Foam System v. Urquhart, 202 F.2d 659 (3d Cir. 1953), wherein the court noted that it was "proper to grant licenses and determine royalties through sales of unpatented materials used in connection with the patent, [and that] such method is interdicted as a patent misuse in instances where a license can be obtained only by purchasing the unpatented materials from the person granting the license * * *." 202 F.2d at 663–664.

The court in Calhoun v. United States, 339 F.2d 665, 168 Ct.Cl. 663 (1964), held that the patent involved had not been misused in that there was no restraint of trade.

To the same effect is United States v. Parker-Rust-Proof Co., 61 F.Supp. 805 (D.Mich.1945), the court held that

"The owner of a patent has a right to fix royalties * * * [and] [h]e may

enter into any kind of a contract to protect [that right] so long as he does not attach a condition to the contract which will have the effect of enlarging his monopoly beyond that covered by the patent." 61 F.Supp. at 812.

See also, Stearns v. Tinker & Rasor, 252 F.2d 589, 600, 604 (9th Cir. 1957); McCullough Tool Co. v. Well Surveys, Inc., 343 F.2d 381, 404–410 (10th Cir. 1965); McCullough Tool Co. v. Well Surveys, Inc., 395 F.2d 230 (10th Cir. 1968); Well Surveys, Inc. v. Perfo-Log, Inc., 396 F.2d 15 (10th Cir. 1968); Plastic Contact Lens Co. v. Butterfield, 366 F.2d 338, 343 (9th Cir. 1966); H–P–M Development Corp. v. Watson-Stillman Co., 71 F.Supp. 906 (D.N.J.1947); American Optical Co. v. New Jersey Optical Co., 58 F.Supp. 601 (D.Mass.1944).

12. See notes 6–8 and accompanying text, *supra.* See also, Calhoun v. United States, 339 F.2d 665, 168 Ct.Cl. 663 (1964); National Foam System v. Urquhart, 202 F.2d 659 (3d Cir. 1953); United States v. Parker-Rust-Proof Co., 61 F.Supp. 805 (D.Mich.1945).

tinent brought suit against Mercoid for contributory infringement on the ground that it manufactured and sold combustion stoker switches for use in the patented combination. The Supreme Court affirmed the District Court's finding that the defendants, Mid-Continent and Minneapolis-Honeywell, had "endeavored to use the license agreement so as to prevent the sale or use of combustion stoker switches in these heating systems unless they were the switches made by Minneapolis-Honeywell and purchased from it or its sub-licensees." 320 U.S. at 663, 64 S.Ct. at 270. The Court held that the defendants had misused the combination patent and stated that the "competition which is sought to be controlled is not competition in the sale of the patented assembly but merely competition in the sale of the unpatented thermostatic controls." 320 U.S. at 667, 64 S.Ct. at 272. This finding of a restraint on free competition in items outside the scope of the patent grant was the crux of the Court's decision that the patent had been misused.

▬▬▬▬ Thus it is clear that *Mercoid* does not support defendants' position, for it is clearly distinguishable on its facts. The only similarity between *Mercoid* and the instant case is that royalties were paid on unpatented parts. As we have seen, however, that is not determinative for that common thread was also present in *Hazeltine* where no misuse was found. The fact that royalties are paid on unpatented parts standing by itself is not

the test of patent misuse.[13] The distinction between *Mercoid* and *Hazeltine* is the *purpose* and *effect* of the agreement to pay royalties on unpatented parts. In *Mercoid,* the purpose and effect of the agreement to pay royalties on unpatented parts was to enlarge the monopoly granted by the patent to cover unpatented parts or portions.[14] In *Hazeltine,* the agreement did not, nor was it intended to, result in an extension of the patent monopoly; its sole purpose was to establish a reasonable royalty base.[15] The purpose and effect of the royalty provision here is the same as in *Hazeltine* and is totally distinguishable from the purpose and effect of the license agreement in *Mercoid.*

In *Hazeltine,* the Supreme Court distinguished *Mercoid* by stating that "[t]he principle of those cases [Mercoid and others] cannot be contorted to circumscribe the instant situation. This royalty provision does not create another monopoly; it creates no restraint or competition beyond the legitimate grant of the patent." 339 U.S. at 832–833, 70 S. Ct. at 897. That observation is equally applicable to the royalty provision here. In the case at bar it did not result in an extension of the patent monopoly nor did it create even the slightest restraint on free competition beyond the legitimate grant of the patent, its sole purpose and effect was to provide a measure of reasonable compensation for the invention.

Therefore, it is our conclusion that this case is governed by the *Hazeltine*

---

13. See note 11 and accompanying text, *supra.*

14. The Supreme Court in *Mercoid* specifically found that the defendants had "endeavored to use the license agreement so as to prevent the sale or use of combustion stoker switches in these heating systems unless they were the switches made by Minneapolis-Honeywell and purchased from it or its sub-licensees. * * *

 * * * * *

[And] that the competition which is sought to be controlled is not competition in the sale of the patented assembly but merely competition in the sale of

the unpatented thermostatic controls." 320 U.S. at 663, 667, 64 S.Ct. at 272.

15. In *Hazeltine,* the Supreme Court stated:
 "The principle of those cases [the classical misuse cases. e. g., *Mercoid, supra, Morton Salt Co., supra,* and *Ethyl Gasoline Corp., supra*] cannot be contorted to circumscribe the instant situation. This royalty provision does not create another monopoly; it creates no restraint of competition beyond the legitimate grant of the patent. The right to a patent includes the right to market the use of the patent at a reasonable return." 339 U.S. at 832–833, 70 S.Ct. at 897.

line of cases and that in accordance with this, plaintiffs did not misuse the patent by utilization of unpatented parts or portions in conjunction with the patented system as a means of determining the royalty base.

The conditional findings re patent misuse are supplanted by the views here expressed.